No. 36,229

CHARLES B. THUMMEL and BERTHA THUMMEL, *Appellees,* v. THE KANSAS STATE HIGHWAY COMMISSION, *Appellant.*

(164 P. 2d 72)

Opinion filed December 8, 1945.

*Otho Lomax,* assistant attorney general, and *W. H. Vernon,* of Larned, argued the cause, and *Eldon Wallingford,* of New York, N. Y., was on the briefs for the appellant.

*John A. Etling,* of Kinsley, argued the cause, and *W. N. Beezley,* of Kinsley, was on the briefs for the appellees.

The opinion of the court was delivered by

BURCH, J.: This is an action for damages for wrongful deaths alleged to have resulted from a defect in a state highway. The jury was unable to agree. The defendant has appealed from orders overruling its demurrer to plaintiffs' evidence, its motion for a directed verdict and its request for certain instructions. Marie Thummel and Georgine Thummel, two young daughters of the plaintiffs, together with two other occupants of an automobile, were drowned in the waters of Coon creek, near Kinsley, Kan., on July 9, 1942. The story of the tragedy as it develops for consideration on demurrer follows:

About 10:30 at night Raymond Dvorak and James O'Brien drove to the home of the two girls and in the course of the visit which followed it was suggested that they get into the car, drive out somewhere and get some soft drinks. From the Thummel home the car was driven by Raymond Dvorak to a filling station which was located near the east extremity of Kinsley in a triangular piece of ground at the junction of U. S. Highway 50S and a new highway project designated as 50S-24-FA 302 H (5). Hereinafter Highway 50S will be referred to as the highway and the new project will be referred to as the project. The project ran in a northeasterly direction from a point approximately across from the filling station, while the highway ran almost straight east. As they rode out of the filling station and onto the highway, the occupants of the car proceeded to the east a little less than a mile on the highway until they must have reached the intersection of the highway and a township road which ran north to a point where the township road intersected the project. It is possible that the four young people stopped on the township road for a short time before proceeding to the intersection, but whether they did is not significant.

About nine weeks prior to the calamity there occurred in the vicinity north and east of the city of Kinsley a notoriously destructive flood. As a result thereof the township road had been washed out immediately north of its intersection with the project and the township officials had erected a barricade across the township road immediately north of the intersection, but the state highway commission had not erected any barricade on the project so that it was

possible to turn off of the township road onto the project and proceed in a southwesterly direction. Apparently the automobile did so. Testimony was introduced showing that at the time the project was in a drivable condition. Its surface was not "black-topped" or paved but it appeared to be a good, wide, graded road with two definite lanes of travel available upon its surface.

Nothing was heard of the Thummel girls or their escorts after they left the filling station until the evening of the next day when they all were found drowned in Coon creek. In order for the automobile to have reached Coon creek from the intersection hereinbefore referred to it would have been necessary for it to have been driven along the project in the southwesterly direction until it came to a barricade which had been installed about thirteen feet northeast of a washout adjacent to the northeast end of the Coon creek bridge. The barricade had been erected by employees of the state highway commission. The evidence developed that the barricade consisted of a snow fence which extended only part way across the highway so that it was possible to drive the automobile around the right side of the barricade without driving off the shoulder of the highway. The snow fence originally had been painted red, but it had become so weather-beaten that it was difficult to distinguish it from the surrounding visibilities. The road beneath it was so similar to the color of the barricade that a motorist might not have detected the presence of the barricade in time to have stopped in the ordinary course of travel before running into it. One witness testified that she could not see it the next evening, even though she knew it was there, until she was within about fifteen feet of it. The sheriff, who found the automobile and later the bodies of its occupants in Coon creek, testified that he found evidence of car tracks to the northeast of the barricade which indicated that the automobile had been driven gradually to the right side of the project beginning at a point some twenty to twenty-five feet northeast of the barricade and had proceeded from such point past the right end of the barricade and had continued until it reached the precipitous banks of the washout where it ran on into a pool of water which was eight or ten feet deep. When the car was found it was headed in the opposite direction in which it apparently had been going immediately prior to its fall into the water, but there was no evidence of the car having been turned around and there was no evidence of tracks of any kind on the other side of the washout.

In addition to evidence of the foregoing, the plaintiffs introduced a stipulation which admitted that in April, 1941, the state highway commission had passed a resolution, pursuant to which a right of way had been acquired for a relocation of a portion of the highway so that eventually the project would be substituted for the highway as a part of Highway 50S. It also was stipulated that a contract had been let by the state highway commission for the earth and culvert work on the project and that such work had been completed and accepted on August 30, 1941, by the state highway commission; that the bridges on the project had been completed and accepted with the exception of the bridge across the Arkansas river which was not accepted until August 15, 1942. The plaintiffs also proved that some of the flood damage which had occurred during the spring of 1942 had been repaired by employees of the state highway commission; that authorized representatives of the commission had knowledge of the defect in the project long in excess of the time required by the applicable statute; that the statutory demand had been made and that the project had been used by the public.

The evidence relative to the use of the project by the public and others requires careful scrutiny because unless a state highway has been opened for travel and there has been extended to the public an invitation, either expressed or implied, to use the highway, then there is no basis for recovery from the state.

The evidence touching upon the question of whether the project was open for travel may be summarized as follows: As before stated, there was no barricade on the township road south of its intersection with the project and there was no barricade immediately west or east of its intersection with the project. The plaintiffs' witness, Fred Lancaster, testified that he could get onto the project through his driveway or at the southwest end of such project, or on the township road intersection with it. He further testified that in 1941 there was a time when he didn't remember seeing a sign at the intersection of the project and the highway immediately east of Kinsley. He was asked the following question and gave the following answer:

"Q. And in the fall of 1941, Mr. Lancaster, did you observe traffic on this new road, would you see other people driving on it? A. Yes, sir; several of them drove that road, a lot of them."

Fred Fletcher testified:

"Q. Do you recall whether the grade there was well beaten by traffic? A. Well, it was good road."

Sherman Holland, a witness for the plaintiffs, testified that in the fall of 1941 and in the spring of 1942 he observed some travel on the project. When asked whether the road showed signs of considerable traffic, he replied there was some traffic on it and that the project showed signs of traffic the full width of it. He testified that after September 5, 1941, at which time the Coon Creek bridge was completed, the traffic on the project between the city of Kinsley and the intersection of the township road was by maintenance and construction workers and sight-seers.

Fred Fletcher also testified that in the fall of 1941 he traveled the project about every day from his home northeast of Kinsley. He would drive south on the township road until he came to the project and then would drive on it into the city of Kinsley. He stated he was certain that the project at that time was being maintained by the state highway department and that employees thereof observed him using the project road and did not make any objection to his using it; that on such occasions he also met other people who were using the project and that it was used quite extensively. Mrs. Fred Fletcher testified that she had used the project many times prior to the flood and that while it was being maintained by the highway department, she saw other cars on it and that the project road showed signs of considerable traffic. The father of the girls testified that he traveled the project in the fall of 1941 and spring of 1942 before the flood.

The resolution introduced by plaintiffs read as follows:

"Resolution for Relocation and Redesignation of road in Edwards County, Project 50S-24-FA 302 H. (5) . . . be established, laid out, and opened in Edwards County, and be designated as a state highway and as a part of the state highway system in Edwards County, Kansas, and

That the road in said county, which has dangerous curves, described as follows, to-wit: [describing old road.]

"Be hereby withdrawn from the system of state highways in Edwards County, Kansas, with the provision that the road shall be maintained and traveled as a detour highway until such time as the herein designated route shall be completed and opened for traffic.

"Net length of Old Road            2.164 miles
Net length of New Road            1.880 miles
Difference                 .          0.284 miles (deduction)"

Counsel for the plaintiffs contend that the resolution, the construction work and the testimony as to the use, maintenance and condition of the project road are sufficient to raise a question of fact for the jury to determine whether the project road by implication had been opened for travel. The district court overruled the defendant's demurrer and submitted that issue, with others, to the jury. In support of the contention and the ruling the plaintiffs cite the case of *Payne v. State Highway Comm.*, 136 Kan. 561, 16 P. 2d 509. The opinion in the cited case contains the following statement:

"There may be a defect in a state highway before it is improved or constructed, but liability under the statute does not arise until such highway is open for travel. This is the fundamental basis of liability. Designation is the first step in the establishment of a state highway, but does not necessarily open it for travel. It is not open for travel until there has been extended to the public an invitation, expressed or implied, to use such highway. When a highway is open for travel may, under certain circumstances, be a question of law for the court. On the other hand, cases may arise where it would be a question of fact for the jury to determine under all of the circumstances of the particular case. It is clear to us that the legislature did not intend liability should arise against the state for defects on the mere designation of a strip of land as a highway. The construction of the highway must have reached a point where the ordinary, prudent person would be warranted in believing that it was open to public use and a safe place to travel." (p. 565.)

1. In the case of *Payne v. State Highway Comm.*, supra, the alleged accident occurred at a time when the project was not being used for highway purposes and a review of the facts in such case clearly discloses that the project had not been opened for travel. Moreover, the plaintiff in such case was not using any part of the project as a highway but on the contrary regarded the involved area as part of his farm, and while he was operating a lister it struck a stake which had been driven level with the ground by an employee of the highway department. Under such circumstances this court held, as a matter of law, that the highway had not been opened for travel and that no invitation had been extended, by implication, to the public to use it and that consequently no liability existed on the part of the state. The present case presents a more difficult question for decision. Counsel for the defendant contend that the record discloses no evidence which warranted the trial court in overruling the defendant's demurrer insofar as it raised the question whether any showing had been made to the effect that the project had been, by implication, opened to public use for travel purposes.

In such connection the defendant contends that it affirmatively appears from plaintiffs' evidence that a regularly established and opened state highway existed from the northeast end of the project, which was barricaded, and the southwest end of the project, which was also barricaded; and further that such highway was designated as US 50S and all road signs directed traffic over such regularly established and maintained highway into and out of the city of Kinsley from the east city limits to a point approximately two miles northeast thereof, which point was also the northeast extremity of the project. Counsel for the plaintiffs contend, however, that the project also was opened, by implication, from the point where the township road entered such project running in a southwesterly direction to the point of the washout immediately northeast of the Coon creek bridge where the snow fence barricade had been erected.

Viewing the plaintiffs' evidence in its most favorable light from the standpoint of the demurrer, it can be said that a driver of a car in the vicinity of the city of Kinsley might have desired to go north on the township road for some purpose and upon reaching the intersection thereof with the project would have noted the barricade across the continuation of the township road and upon seeing the project road leading to the southwest would have thought it was reasonably safe to travel thereon and therefore have turned the automobile in such direction and continued thereon until the automobile reached the barricade near the Coon creek bridge. Consequently, it is the opinion of the court that the statement hereinbefore quoted from the case of *Payne v. State. Highway Comm.*, supra, is controlling and that the trial court was justified in submitting to the jury the question, among others, whether the project had been opened for public travel by implication. In such connection it should be noted that under the evidence submitted it cannot be said, as a matter of law, that the condition of the project at the point of its intersection with the township road was such that it did not invite public traffic or that an ordinarily prudent person would not have been warranted in believing that the project was open and a safe place to travel. Such a question was for the jury. So far as the traveling public is concerned, a highway is open if by its condition it presents, in the mind of an ordinarily prudent person, an invitation to travel thereon. A township road is as much a public road as any other and in many cases township and county roads are better than some state highways. If a traveler reaches a project

road and sees that it is well traveled and there are no signs thereon indicating that it should not be used, it then becomes a question for the jury whether, under the existing circumstances, an ordinarily prudent traveler would have regarded the project as having been opened for public use. As hereinbefore set forth, the testimony in the present case develops that one witness testified he had traveled that part of the project many times; that he had seen others traveling it; that highway employees had seen him traveling it and had not protested; that it was a good road. Another testified that the road showed signs of traffic the full width of it; and still another testified that the road had good tracks on both sides. These conditions were shown to have been known and permitted by the highway commission and, therefore, the question whether they were such as to have constituted an implied invitation to an ordinarily prudent person to travel thereon must be regarded as one for the jury. The court is of the opinion that it would be unwise to have the law in such condition that the highway commission might aquiesce in the public use of a road and avoid liability for injuries resulting from defects therein.

2. The next question raised by the defendant's demurrer is whether there was any evidence introduced by the plaintiffs proving that the accident was due to a defect in the project. In other words, it is the contention of the defendant that nothing was shown except that an accident occurred, and that beyond such showing the plaintiffs' case rests purely on speculation and conjecture. It is well settled that the mere occurrence of an accident is not evidence of its proximate cause. Juries, however, are permitted to draw reasonable inferences from established circumstances even in the absence of direct and positive testimony, provided the circumstances relied upon are of such a nature and so related one to the other that a reasonable conclusion to be drawn therefrom is the theory sought to be established. No contention is made in the instant case that the washout, which extended across the project as well as on the sides of it, did not constitute a defect. As herein stated the evidence of the plaintiffs established that the snow fence barricade was difficult for a motorist to see. Evidence as to tracks made by the car developed the following: "I believe the furtherest back that I noticed them [20 to 25 feet from the barricade] it looked like the brakes had been applied, and from there on it was a continuous line on a slight angle, showing very slightly, like a skid would be, just enough

to be noticeable." The evidence also was to the effect that the washout was ten or fifteen feet beyond the barricade; that both wheels were on the top of the road but on the extreme right-hand side—inside the vegetation; and that the tracks just missed the side of the barricade. Other evidence as to tracks conflicted somewhat with the foregoing but we can consider only the evidence favorable to the plaintiffs for the purpose of the demurrer. Such conditions bring us to consideration of the rule of circumstantial evidence and its application in this case. The plaintiffs contend that the evidence, circumstantial and otherwise, justifies the conclusion that the driver of the car could not see the barricade until he was twenty to twenty-five feet from it; that he then applied the car brakes, turned the car to the extreme right side of the project road and was unable to stop the car before it came to the bank of the washout some ten or fifteen feet beyond the barricade. Adding the estimates as to distances from the point where the car started to turn to the right results in the observation that the car traveled only thirty or forty feet after it began to turn before it ran into the washout. In the face of such evidence this court cannot assume that the driver of the car saw the barricade in adequate time to have stopped the car before it reached the barricade but nevertheless deliberately drove off the project road into the field near the end of the bridge for some unexplained reason. We are confronted also with the presumption of due care in death cases. Consequently, this court is unable to say, as matter of law, in this case that the plaintiffs' direct and circumstantial evidence wholly failed to prove a cause of action.

3. The defendant contends also that its demurrer should have been sustained because it affirmatively appears from the plaintiffs' evidence that the proximate cause of the accident was the negligence of the driver of the car; that without such negligence no accident would have occurred and that consequently the driver's negligence was the only proximate cause. The question of contributory negligence is not involved in the present case. It was not pleaded and it is not contended that the two little girls were negligent. Neither is it alleged that any negligence of the driver can be imputed to the girls on the theory of joint enterprise, agency or any other theory. The issue is clear under the pleadings: Was the accident due to a defect in the project or to the negligence of the driver of the car? The defendant cites in support of its contention the case of *Mosier v. State Highway Comm.*, 136 Kan. 468,

16 P. 2d 477. The cited case is clearly a contributory negligence case and is not in point. Our attention is also called to the case of *Smith v. Mead Construction Co.*, 129 Kan. 229, 282 Pac. 708. The cited case is authority for the rule if two distinct causes are successive and unrelated in their operation one must be regarded as the proximate cause and the other as the remote cause. Assuming that the driver of the car was negligent, can it be said in the present case that his negligence was unrelated to and distinct from the difficult-to-distinguish barricade and the defect beyond it? Can we in this case disregard the defect as a remote cause and conclude, as a matter of law, that the driver's negligence caused the accident? Our opinion is in the negative. In the last cited case the jury found that the driver of the car was negligent and in order to bring the case squarely in point we would be forced to conclude that the driver was negligent in the present case. We pass the question for the moment. The defendant also cites the case of *Whitcomb v. Atchison, T. & S. F. Rly. Co.*, 128 Kan. 749, 280 Pac. 900, in which case a demurrer was sustained to a petition. In that case, however, the petition clearly discloses that the accident was due to the negligence of a third party and not to any negligent omission on the part of the railway. The defendant also relies on the case of *Norris v. Ross Township*, 98 Kan. 394, 161 Pac. 582. In such case the township did not have five days' notice of the defect which caused the accident, and the decision turns on such a point. Ordinarily the question of what is the proximate cause is one for the jury. (See *Clark v. Powder Co.*, 94 Kan. 268, 146 Pac. 320, and *Corley v. Railway Co.*, 95 Kan. 124, 147 Pac. 842.)

Difficulty, however, frequently occurs in the application of the law relative to proximate and remote causes and since counsel for the defendant insist that the proximate cause in this case must have been the negligence of the driver, as a matter of law, additional consideration will be given the contention. The case of *Clark v. Powder Co.*, supra, has been cited with approval by this court in many subsequent decisions and may be regarded as a leading case on the subject. Reference to the opinion in such case, which was written by Mr. Justice Dawson, who was later Chief Justice, discloses that the law relative to intervening causes is not controlling and does not necessarily relieve a defendant of liability in cases wherein it is clear that the injury or damage is the natural

and probable consequence of the original wrongful act. From the opinion the following is quoted: "Running through all the precedents in analogous cases the test appears to be: Is the injury or damage the natural and probable consequence of the original negligence? The mere intrusion of an intervening agency does not always excuse the original wrongdoer." Continuing, the opinion quotes with approval from the case of *Stone v. Boston & Albany Railroad*, 171 Mass. 536, 51 N. E. 1, the following:

". . . it was the duty of the original wrongdoer to anticipate and provide against such intervention, because such intervention was a thing likely to happen in the ordinary course of events. . . . 'In actions of this description, the defendant is liable for the natural and probable consequences of his negligent act or omission. The injury must be the direct result of the misconduct charged; but it will not be considered too remote if, according to the usual experience of mankind, the result ought to have been apprehended. The act of a third person, intervening and contributing a condition necessary to the injurious effect of the original negligence, will not excuse the first wrongdoer, if such act ought to have been foreseen. The original negligence still remains a culpable and direct cause of the injury. . .' The question is not whether it was a possible consequence, but whether it was probable, that is, likely to occur, according to the usual experience of mankind . . . a wrongdoer is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience. One is bound to anticipate and provide against what usually happens and what is likely to happen; but it would impose too heavy a responsibility to hold him bound in like manner to guard against what is unusual and unlikely to happen, or what, as it is sometimes said, is only remotely and slightly probable." (p. 273.)

In considering the question it is well to bear in mind, that in fixing the proximate cause of injury or damage, it is not necessary that ordinary caution and prudence would require that a specific injury would probably result but only that some injury would likely result therefrom. (*Walmsley v. Telephone Association*, 102 Kan. 139, 169 Pac. 197.) We are aware also of the rule that where an injury may be due to two causes, one an inanimate object and the other a negligent act of another, that the person who committed the negligent act is held liable but such a rule is subject to the qualification that the position of the inanimate object and the part which it played in the accident cannot be attributed to the wrongdoing of some third person. (*Durst v. Wareham*, 132 Kan. 785, 297 Pac. 675.) It is true that ordinarily cases involving proximate and remote causes also involve different acts of negli-

gence as distinguished from one act of negligence and a statutory liability such as a defect in a highway. However, the same rule has been applied in cases wherein one of the causes is statutory in its nature such as a defect in a highway and the other is based upon common-law negligence. (See *Lincoln Township v. Koenig*, 10 Kan. App. 504, 63 Pac. 90.) In the present case since the question whether the project was open by implication was for the jury, then it must follow from what has been said that the question whether the defect in the project was the proximate cause of the accident was also for the jury. It cannot be said, as a matter of law in this case, that a reasonably prudent person would not have anticipated that the project would be used for travel purposes. Such in turn would have necessitated that a barrier of adequate visibility should have been erected in such manner that it would have served as a warning to the driver of an automobile of the hazard beyond it in time for the driver to have seen the barrier and avoided an accident. The contention might be advanced that the failure to erect an adequate barricade was an omission in the nature of negligence and that the statutory liability is not predicated upon negligence. However, it is alleged that the failure to surround the washout with sufficient and proper barriers, having lights, reflectors, signs, notices or warnings thereon, constituted a defect in the project and from a practical standpoint a contention to the contrary would not be sound. (See *Story v. Brown County*, 116 Kan. 300, 226 Pac. 772, and *Snyder v. Pottawatomie County Comm'rs.*, 120 Kan. 659, 245 Pac. 162.) In the opinion of the court a jury in the present case could have found from the evidence of the plaintiffs that the proximate cause of the accident was the improperly-guarded defect in the project. The jury also could have found that the proximate cause was the intervening careless driving of the car as indicated by the track testimony to the effect that the car was traveling at such speed when it reached the washout that it did not cave in the sides thereof before plunging into the same. Therefore, the proximate cause was a question for the jury. We need not pass upon the question whether the negligence of the driver was established as a matter of law because if a jury, on retrial, should find the acts or omissions of the driver were not the proximate cause of the accident, then the question would become immaterial.

4. Counsel for the defendant urge us to consider certain instruc-

tions which they contend are erroneous. Perhaps it would be helpful to respective counsel and the trial court if we depart from our usual rule and consider the question from an anticipatory standpoint. To do so, however, would require us to anticipate too much. It would require us to assume that the same evidence would be introduced; that the trial court would make the same rulings on demurrers and on a motion for a directed verdict and give the same instructions. On retrial a verdict of a jury or its answers to special questions might make possible errors in instructions immaterial. We neither approve nor disapprove the instructions because in the present case the jury was unable to agree and therefore, in this appeal we do not reach the question of what instructions should be given in some other trial.

Counsel for the defendant request us to consider also the possible errors arising in connection with the overruling of the demurrer to all the evidence and the motion for a directed verdict. Such rulings raise only the same questions raised by the demurrer to the plaintiffs' evidence. No new uncontradicted defense testimony was injected into the record which requires a different ruling on the demurrer to all the evidence and on the motion for a directed verdict. Therefore, the rulings of the district court are affirmed.

THIELE, J. (dissenting): I dissent. My reasons for so doing include the following: The resolution for establishment, laying out and opening the new road (on which the accident occurred) is quoted in the court's opinion. Under that resolution the new road was not to be a part of the state highway system until it should be completed and opened for traffic. Much has been said about it being opened for traffic. Without discussing that feature, I am unable to find any evidence even hinting it was completed—the evidence is all to the contrary. The partly constructed highway was not a part of the state highway system and the defendant commission is not liable under the statute. Even if it were, the evidence shows clearly that the car in which decedents were riding was driven around the barricade in the roadway. It makes no difference that some witness testified she had difficulty in seeing the barricade, or that another said it was hard to see. The undisputed fact is that the driver of the car and those in it saw the barricade and drove around it to their untimely ends. Where plaintiff's evidence shows contributory negligence the defendant may take ad-

vantage of it by demurrer. (*Houdashelt v. State Highway Comm.*, 137 Kan. 485, syl. ¶ 3, 21 P. 2d 343; *Slaton v. Union Electric Ry. Co.*, 158 Kan. 132, syl. ¶ 5, 145 P. 2d 456; *Moler v. Cox*, 158 Kan. 589, 595, 149 P. 2d 611.) The demurrer to plaintiff's evidence should have been sustained.

HARVEY, C. J., concurs in the foregoing dissenting opinion.

BURCH, J. (dissenting): With reluctance I find I am unable to concur in the court's decision. The opinion perhaps is sound from the standpoint of public safety, but the basis of liability is not the public safety because at common law there was no liability on the part of the state arising by reason of the state's failure to provide for public safety. Therefore, the logic of the court's opinion fails because it has no foundation for its creation. The only liability in this case must be strictly statutory in origin and all other theories of liability fall if the fundamental foundation does not support them.

At common law no right of recovery against a state was created by reason of defects existing in a state highway. The construction and maintenance of public highways are the exercise of a governmental function, for the improper discharge of which no liability exists except as created by statute. Therefore, such statutes are in derogation of the common law and are conditional. They cannot be extended beyond the statutory limitations or enlarged by construction. The liability is not founded on the law of negligence but is created wholly by legislative enactment. (*Arnold v. Coffey County Comm'rs*, 131 Kan. 343, 291 Pac. 762; *Gorges v. State Highway Comm.*, 135 Kan. 371, 372, 10 P. 2d 834.) Unless the road involved is a state highway no liability is created. (*Summerville v. State Highway Comm.*, 139 Kan. 530, 32 P. 2d 224.) The rule requiring strict limitation has been applied by most of the states. For recent examples, see: *Ellis v. Cannon*, 113 Vt. 511, 37 A. 2d 377; *Goodrich v. County of Kalamazoo*, 304 Mich. 442, 8 N. W. 2d 130; *McManus v. Jarvis*, 128 Conn. 707, 22 A. 2d 857; *Fann v. State Highway Department*, 167 S. C. 84, 165 S. E. 785.

The state is not an insurer of the safety of travelers on its highways. Its liability arises only by reason of its consent to be sued and, therefore, parties seeking recovery must bring themselves unquestionably within the prescribed and limited consent of the state. (See: *Barker v. Hufty Rock Asphalt Co.*, 136 Kan. 834, 836, 18 P.

2d 568; *Parsons v. State Highway Comm.*, 146 Kan. 476, 72 P. 2d 75; and, also *Boskovich v. King County*, 188 Wash. 63, 61 P. 2d 1299.) Such is the rule regardless of the fact that we have a statute in this state to the effect that general statutes are to be liberally construed to promote their objects even though such statutes be in derogation of the common law. (G. S. 1935, 77-109.)

Having the foregoing general principles in mind, consideration must be given to the intent of the legislature in fixing liability on the part of the state highway commission. The statute provides:

"Any person who shall without contributing negligence on his part sustain damage by reason of any . . . defect in a state highway, . . . and for any damage so sustained the injured party may sue the state highway commission, . . ." (G. S. 1935, 68-419.)

In the case of *Payne v. State Highway Comm.*, supra, this court, in substance, held that G. S. 1935, 68-406 must be construed in *pari materia* with the above-quoted statute. Otherwise there would have been no statutory basis for the result reached in the Payne case. A contrary result was reached in the case of *Reading Township v. Telfer*, 57 Kan. 798, 48 Pac. 134, which was cited in the Payne case, and which construed two statutes as not being in *pari materia*. Consequently, the basis for decision in the case of *Reading Township v. Telfer*, supra, was not present in the Payne case and we clearly held in such case that no liability could arise against the state highway commission unless under the authority of G. S. 1935, 68-406, the highway had been opened for travel. Therefore, compliance must be made with all the provisions of· 68-406 before liability arises under section 68-419. Consequently, we should determine what must appear in order to show that compliance has been made with section 68-406. Such section provides:

"That the state highway commission shall *designate,* adopt and *establish* and may lay out, *open,* relocate, alter, vacate, redesignate and re-establish highways . . ." (Italics supplied.)

Designation and adoption by resolution are only the formal paper requisites preliminary to establishment. *Establishment,* however, which is a requirement of the statute, is a different element from *designation.* Such is true also of the *opening* of a highway. Before discussing the meaning of such terms, it should be noted that the only party or commission which is given any statutory power to make a designation of a highway is the state highway commission. It is equally true that the only party or body which has the right

to establish or open a state highway is the same commission. No other person or agency of the state has any authority whatever to do so.

The word "establish" carries with it usually the inference, at least, of permanence. In *Robinson v. Swing et al.*, 70 Ohio App. 83, 36 N. E. 2d 880, the court adopted the following definition from ,the Oxford English Dictionary:

"To fix, settle, institute, or ordain permanently—to set up on a secure basis, to render stable or firm."

See, also, 2 Words and Phrases, 2d series, p. 323, citing *Hurd v. City of Fairbury*, 87 Neb. 745, 128 N. W. 638, 640. The words "establish" and "established" are not synonymous with the word "locate." (See *State, ex rel. College v. Irvine*, 14 Wyo. 318, 84 Pac. 90, 106, 107.) In defining the word "established" as applied to an existing legal organization, this court has cited, with approval on two occasions, the following statement from *State, ex rel, &c. v. Rogers*, 107 Ala. 444, 453:

"It is as often employed to signify the putting or fixing on a firm basis, of putting in a settled or an efficient state or condition, . . ." (See: *Armstrong v. George*, 84 Kan. 248, 251, and *State ex rel., v. Board of Education*, 111 Kan. 598, 600.)

See, also, 15 Words and Phrases, Perm. ed., p. 155 *et seq.* Those interested in the etymological meaning of the word will find that it differs from the words "construct" and "design." (See: *Ronnow v. City of Las Vegas*, 57 Nev. 332, 65 P. 2d 133, 140; and *Village of Brockport v. Green*, 79 N. Y. S. 416, 418, 39 Misc. 231.) In applying the meaning of the term in connection with the establishment of roads, it has been held that "location" is not the equivalent of "establishment." (See *Dickey v. Maysvill W. P. & L. Turnpike Co.*, 37 Ky. [7 Dana] 113, 125.)

Many shades of meaning have been given the word by judicial construction but there is unquestionably much legal precedent to warrant construing it as meaning—to settle and confirm in a permanent, efficient state or condition.

In the case of *Robinson v. Swing et al.*, supra, it was held as follows:

"The use of this term 'establish' in the statute implies that some affirmative act on the part of the commissioners should intervene before liability is created." (p. 885.)

Perhaps such is sound law and possibly this court should hold

that before a highway can be considered as having been established, it is necessary that the only body which has authority to establish it, to wit: the state highway commission, must, by affirmative action, or at least by some overt act on its part, have indicated that the highway had been established. It should not be necessary in such connection to show that the highway had been established and opened by the adoption of a formal resolution to such effect. To so require would put too narrow an interpretation upon the statute. (See *Cowley County v. Johnson,* 76 Kan. 65, 90 Pac. 805.) Even if affirmative action is not necessarily required a highway should not be considered as having been established by the commission if no part of the project had been completed as anticipated. A highway might be considered as established if acceptance had been made of substantially all of the work incident to the completion of the highway and the state highway commission, not others, had indicated in any manner that the project had reached a degree of completion prerequisite to the actual opening of the highway for travel purposes. Surely it was never the intent of the legislature that liability should arise against the state in connection with road building projects before their completion and before the highway commission indicated in any manner that such road projects were a part of the state highway system.

As before indicated the opening of a highway is a different act from either designation or establishment. In the case of *Curtis v. Pocahontas County,* 72 Iowa 151, 33 N. W. 616, the Supreme Court of Iowa held that a petition seeking to have a road opened for travel was insufficient for the purpose of having a highway established and that such a petition did not vest the supervisors with any jurisdiction in the matter and that all acts done by them under such a petition were void. In the case of *Wilcoxon v. San Luis Obispo,* 101 Cal. 508, 35 Pac. 988, it was held:

"The term 'open' refers to the throwing open to the public what was before appropriated to individual use and the removing of such obstructions as exist on the surface of the earth rather than any artificial improvement of the surface." (p. 510.)

See, also, 29 Words and Phrases, Perm. ed., p. 507 *et seq.*

In the case of *Valentine v. City of Hagerstown,* 86 Md. 486, 38 Atl. 931, 932, it was held that streets cannot be considered laid out and opened until there has been a formal acceptance of them by authorities of the town according to law, though they may have

been, since an alleged dedication, used as streets by the owners of property and may have been generally considered streets of the town. See, also, *Ryan v. Township of Royal Oak*, 289 Mich. 469, 286 N. W. 793. In the case of *Matter of City of New York*, 192 N. Y. 459, 85 N. E. 755, it was held that a new street was not "open" within the statute until there had been an actual physical opening, and in the case of *Johnson & Co. v. Cox*, 196 N. Y. 110, 89 N. E. 454, it was held that a road, intended to take the place of a discontinued thoroughfare, was not "opened" until it was actually and physically opened so that it was capable of public use. (See, also, *O'Neill v. Hemenway* [La. App.] 3 So. 2d 210.) The opening refers to the removing of obstructions that may exist on the surface of the road, or to the installation of signs indicating that the road is open for travel. An opening of a road certainly would necessitate the removal of barricades at each of its extremities provided they were present and such removal necessarily would have to be made under and in furtherance of the authority which is vested solely in the state highway commission by the plain language of the statute. A stranger could not knock down the barricades and thus obligate the state.

To permit sight-seers who drive around the ends of barricades, workmen employed by road and bridge contractors, farmers living in the vicinity, and others who choose voluntarily to use a road, to establish and open it for travel as a state highway so that liability develops against the state, when the right to designate, establish and open a highway is fixed by statutory authority only in the highway commission, would be equivalent to permitting such parties to usurp, seize and hold the statutory rights of the commission without the consent of the state. It would permit such parties to extend the consent of the state to be sued far beyond the expressed legislative intent. As was said in *Barker v. Hufty Rock Asphalt Co.*, supra:

". . . The legislature may give such consent, but before it can be regarded as having waived its sovereign right of immunity, it must be made in express terms so clear as to leave no doubt of the legislative purpose to give the consent. (*Asbell v. State*, 60 Kan. 51, 55 Pac. 338; *State v. Appleton*, 73 Kan. 160, 84 Pac. 753; *Nation v. Tulley*, 86 Kan. 564, 121 Pac. 507; *Garrity v. Board of Administration*, 99 Kan. 695, 162 Pac. 1167; *Construction Co. v. Board of Administration*, 105 Kan. 291, 182 Pac. 386; *McGraw v. Rural High School*, 120 Kan. 413, 243 Pac. 1038.) [p. 836.]

" 'As we understand the rule relating to the immunities attaching to sov-

ereignty, such attributes are never to be considered as waived or surrendered by any inference or implication. The surrender of an attribute of sovereignty being so much at variance with the commonly accepted tenets of government, so much at variance with sound public policy and public welfare, the courts will never say that they have been abrogated, abridged, or surrendered, except in deference to plain, positive legislative declarations to that effect.' (*Construction Co. v. Board of Administration,* 105 Kan. 291, 293.)" (p. 837.)

The court's decision sets forth that the road project as shown by the stipulation, contemplated that the same when completed would be surfaced with black-top. The work on the contract for the surfacing of the project, however, was not completed until long after the catastrophe occurred and was not accepted until November 6, 1943. At the time of the misfortune both the east and west extremities of the project were barricaded and signs had been posted thereon designating that the project was closed and that traffic was prohibited. Such conditions had existed at all times, at least since the occurrence of the flood. Under the circumstances as disclosed by the record, there is nothing to indicate by implication that the state highway commission or anyone acting in its behalf had established or opened the project upon a permanent basis as a state highway. The evidence is persuasive to the contrary because of the barricades at both ends and because of the absence of signs directing traffic upon the project and the presence of signs directing traffic upon the highway. The surfacing work had not been started and in summary the project simply had not been completed. The fact that the project might have been used perhaps more or less extensively at one time by travelers before the flood would not give it that degree of permanence which establishment implies and it should be observed that even if such a conclusion might be developed by implication, nevertheless the implication would have been based upon conduct by others rather than upon conduct by members or representatives of the state highway commission.

We have in the present case an instance wherein the plaintiffs seek to show that the project was established and opened by implication from the conduct of others in direct contradiction to the expressed intent and desire of the highway commission. Because of the rule as to statutory authority such a possibility should not be given judicial approval. How could such a contention be sustained under the rule that before the legislature can be regarded as hav-

ing waived its sovereign immunity, it must be waived in express terms so clear as to leave no doubt of the legislative purpose to give such consent? It is obvious, beyond factual controversy, that the state highway commission, in the performance of its governmental functions incident to the establishment and opening of a state highway, had not opened the project as a state highway in the present case. The state highway commission should be clothed with the authority to say when and where a state highway has been established and opened to the public and our statute so provides. The omission of any action whatever indicating the performance of such governmental functions should not be construed as equivalent to the exercise thereof. The occasional use of a project without objection by representatives of the highway commission is not sufficient to show that it has been established or opened. The mere maintenance of a portion of a road by employees of the commission is likewise not sufficient. (See *Summerville v. State Highway Comm.*, supra.)

The case of *Payne v. State Highway Comm.*, supra, is not controlling in this case because in the present case no highway had been established—an incomplete project only existed. Such was true also in the Payne case but the opinion did not attach any significance to the meaning of the word "establish." In that case it was not necessary to do so because this court held that the project in such case was not open to the public for travel and that reason alone was sufficient upon which to deny liability on the part of the commission. It is possible to conjecture a case wherein a highway might be open to travel by implication if it had been established and nothing remained to be done in connection with the construction and establishment of the highway except to open it for travel. But we do not have such a case before us. The practical effect of the court's opinion is that the highway commission, in order to show that a project is not a state highway, must erect adequate barricades or signs at every point where a public road enters a project no matter how incomplete it may be in order to avoid liability being established against the state by the voluntary use of the project on the part of third parties. From the standpoint of public safety it would be necessary that such barricades or warning signs be maintained at all times in such condition that they would be readily visible to the traveling public. So far as the traveling public is concerned, the effect of a warning sign never having been erected

is the same as it would be in case such a sign had been erected and had been knocked down or was obstructed by weeds. To carry lia- · bility to such an extent would in effect make the state highway commission an insurer of the public safety in cases wherein contributory negligence is absent and such is not the law. (See *Phillips v. State Highway Comm.*, 146 Kan. 112, 68 P. 2d 1087.) If inquiry should be made again as to what happens to the element of public safety in the event the commission fails to erect any barricades or warning signs of any kind at any point on a project, the answer would still remain—there would not be liability on the part of the state at common law for such omission and it could not arise by implication from a statute unless the immunity of the state was clearly waived by such statute. The legislature can provide a standard of conduct which would assure public safety and be a basis of liability in accidents occurring on road projects but it has not done so.

While this is not a case which depends for decision upon whether the project had been established by use or prescription as a state highway, nevertheless the general law relating thereto is enlightening. From 25 Am. Jur. 344, § 9, the following is quoted:

"Generally—Highways may be established by dedication, by prescription, or by the direct action of the public authorities."

As before stated, dedication alone is not sufficient in this state. In the present case there had been no action by the public authorities establishing the highway except the passing of the resolution of dedication and the partial construction of the project. The remaining method—by use or prescription—requires that the highway be used generally by the public and that its use be continuous, uninterrupted and exclusive throughout the prescription period. If the use of the highway is interrupted, prescription is annihilated. (See 25 Am. Jur. 347, § 12.) In Kansas, before a highway can be opened by prescription, it must have been used as a public highway for at least fifteen years. (*State v. Horn*, 35 Kan. 717, 12 Pac. 148.) There is no evidence in the present case that the project was being used as a state highway by the public generally at any time sub-. sequent to the occurrence of the flood. The flood occurred on April 29, 1942, and the accident about seventy days later—on July 9, 1942. During such period, the evidence clearly develops that the public was not using the project as a state highway. The project in the present case never had been established in any of the three

ways prescribed by law and had not reached the status of being a state highway. Consequently liability on the part of the commission did not exist.

The demurrer to the evidence should have been sustained.

HARVEY, C. J., concurs in the foregoing dissenting opinion.