944 F.2d 732
 Joan BROWN; Donna R. Johnson; Susan Matarrese; Geoffrey
Parker; Mary Lynn Sheetz; Peter Sprunger-Froese,
Plaintiffs-Appellees,
v.
Colonel James O. PALMER, Base Commander of Peterson Air
Force Base, Colorado, and Colonel Eugene T.M. Cullinane,
Commander, Headquarters, 3rd Space Support Wing (Afspacecom)
Peterson Air Force Base, Colorado, as officers and agents of
the United States Air Force, an agency of the United States
of America, Defendants-Appellants.
 No. 88-2450.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 10, 1991.
 
 Patricia M. Bryan (Stewart M. Gerson, Asst. Atty. Gen., Washington, D.C., Michael J. Norton, U.S. Atty., Denver, Colo., and Anthony J. Steinmeyer and Alfred Mollin, Attys., Appellate Staff, Civ. Div., U.S. Dept. of Justice, Washington, D.C., on the briefs), for defendants-appellants.
 Newman E. McAllister, (L. Douglas Beatty, with him on the brief), Colorado Springs, Colo., for plaintiffs-appellees.
 Hilary Holland, Westminster, Colo. and David Miller, Denver, Colo., filed a brief for amicus curiae American Civ. Liberties Union of Colorado.
 Before HOLLOWAY, McKAY, LOGAN, SEYMOUR, MOORE, ANDERSON, TACHA, BALDOCK, BRORBY and EBEL, Circuit Judges.
 ON REHEARING EN BANC
 EBEL, Circuit Judge.
 
 
 1
 On October 3, 1990, a panel of this court by majority vote held that Peterson Air Force Base was not a public forum during the open house days that it held in 1985 and 1986 to celebrate Armed Forces Day. Accordingly, we upheld bar letters that had been issued by Peterson AFB against plaintiffs-appellees as a result of their activity in distributing anti-war leaflets during those open houses. Brown v. Palmer, 915 F.2d 1435 (10th Cir.1990). Our decision reversed the judgment of the district court which had concluded, upon cross-motions for summary judgment and a largely undisputed and stipulated record, that Peterson AFB should be characterized as a "public forum" during its 1985 and 1986 Armed Forces Day celebrations.
 
 
 2
 Following our panel decision, appellees petitioned this court for rehearing en banc, and we granted that petition. The thrust of the appellees' argument on rehearing was that the "objective" evidence of what actually occurred at the open houses was sufficient to establish that Peterson AFB was a public forum during the open house events, notwithstanding the subjective testimony of Air Force personnel that they never intended to open up the base to public discussion of political or ideological topics. Appellees also challenged what they perceived to be the panel's determination that military bases should be accorded special status for purposes of analyzing whether they are public fora. Finally, appellees claim that the panel improperly substituted its judgment for that of the district court and that it erred in holding that the Air Force's restrictions on political and ideological speech were viewpoint neutral.
 
 
 3
 We reaffirm our previous panel opinion and do not here repeat either the facts or the legal analysis contained in that opinion. This en banc opinion shall only respond to the specific arguments raised by appellees in their petition for rehearing.[1]
 
 
 4
 Appellees do not challenge the panel's ruling that the ultimate determination of whether Peterson AFB was converted into a public forum during its open houses depends upon the intent of the Air Force. Appellees' Supplemental Brief at p. 2-3, 8. Indeed, the appellees could not argue otherwise in light of rulings both from the United States Supreme Court and from our court. Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985) ("The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse.") (emphasis added); United States v. Albertini, 472 U.S. 675, 686, 105 S.Ct. 2897, 2905, 86 L.Ed.2d 536 (1985); Barnard v. Chamberlain, 897 F.2d 1059, 1064 (10th Cir.1990).
 
 
 5
 Instead, appellees' principal argument on rehearing is that the panel opinion gave undue weight to the affidavits of the Base Commander at Peterson AFB and the Air Force Chief of Staff as to their intent without adequately considering objective evidence of intent based upon the activities that were actually permitted during the open houses. In this regard, appellees misperceive our panel opinion. While it is true that we did look to the affidavits as some evidence of the Air Force's intent, we also looked to the objective evidence of what, in fact, was permitted to occur at the open houses. After reviewing all of the evidence, we concluded that there was a "lack of any evidence" establishing that the Air Force intended to open Peterson AFB to political or ideological debate. Brown v. Palmer, 915 F.2d at 1443. Intent can be discerned both by direct testimony and by indirect evidence of conduct. Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449 ("the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum"). We looked at, and considered, all of the evidence in the record in reaching our conclusion that there was no evidence that the Air Force intended to open Peterson AFB to public political and ideological debate during its open houses.
 
 
 6
 Appellees wrongly assume that just because the Air Force opened up Peterson AFB to some topics of speech and activity and invited the public onto the base that the Air Force should be deemed to have opened the base to all topics of speech and conduct. That is simply not the law. The Supreme Court has made it abundantly clear that the government may selectively preclude discussion of certain general topics while nevertheless inviting the public onto its premises to participate in speech on a variety of other topics.
 
 
 7
 In Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), a municipal mass transit authority permitted advertising within its cars on all subjects except for political advertising. It accepted advertising from retail and service establishments, churches, and civic and public service groups. In addition, of course, the mass transit authority solicited the entire public to enter upon, and to use, its mass transit facilities. Notwithstanding these facts, the Supreme Court concluded that the mass transit authority could, consistent with the First and Fourteenth Amendments, exclude political advertisements.
 
 
 8
 In Perry Education Ass'n. v. Perry Local Educators' Ass'n., 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Court held that a public school district's internal mail system had not become a designated public forum even though the mail system was made available to the union that represented the school employees, the YMCA, Cub Scouts, and other civic and church organizations. The Court upheld the right of the school district to exclude from the mail system a second union which wanted to use that facility for organizing efforts. The Court stated that "selective access did not transform government property into a public forum." Id. at p. 47, 103 S.Ct. at p. 956. Because the school district continued to exercise the right to exclude certain entities from use of its internal mail system, that facility could not be deemed to be a public forum. The school district's policy of excluding an unauthorized union from use of its mail system while allowing its exclusive bargaining agent to use the mail system was held to be reasonable and rationally related to a legitimate school district purpose. Accordingly, the school district's power to exclude the unauthorized union was upheld.
 
 
 9
 In Cornelius, 473 U.S. 788, 105 S.Ct. 3439, the NAACP Legal Defense Fund and other political lobbying groups sought access to government employees through the Combined Federal Campaign (CFC) in order to solicit contributions and to explain their mission. The NAACP Legal Defense Fund argued that the CFC was a public forum because it allowed numerous charities to participate in its campaign. The Supreme Court disagreed, noting that the CFC had chosen to exclude all political advocacy groups, and thus, CFC remained a nonpublic forum. The Court held that it was reasonable for the CFC to exclude political advocacy groups in order to eliminate controversy and in order to avoid the reality or appearance of government entanglement with particular political viewpoints. Thus, the Court upheld the right of CFC to exclude the NAACP Legal Defense Fund.
 
 
 10
 In United States v. Kokinda, --- U.S. ----, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), the United States allowed various groups to distribute leaflets, speak, and picket on the premises of a post office. The government even allowed political statements to be posted on a bulletin board at the post office. However, it did not allow solicitations for money. A group wished to solicit money for political purposes on a sidewalk which was constructed on postal property and which was the means of public access to the post office from the adjacent parking lot. That group claimed, in part, that the sidewalk had become a public forum by virtue of the fact that the public had been invited to use the sidewalk and non-solicitation activities were allowed on those premises. The Supreme Court disagreed. It held: "Even conceding that the forum had been dedicated to some First Amendment uses, and thus is not a purely non-public forum, regulation of the reserved non-public uses would still require application of the reasonableness test." Id. 110 S.Ct. at 3121 (emphasis added). The Court concluded that it was reasonable to exclude solicitations for funds because of the disruptive nature of that expressive activity. Thus, the Court upheld that exclusionary regulation by the Postal Service.
 
 
 11
 If anything, the Supreme Court has been even more accepting of selective restrictions on military bases. In Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), the Court addressed a situation where Ft. Dix had precluded "speeches and demonstrations of a partisan, political nature." The base did, however, welcome visitors, and it routinely invited civilian speakers to give talks ranging from business management to drug abuse as well as to invite civilian clergy to preach religious sermons on base. The base further permitted access to public groups to present theatrical exhibitions and musical programs. Political campaigning, however, was precluded. Notwithstanding that Ft. Dix allowed access to so many other groups for expressive activity, the Supreme Court concluded that Ft. Dix had not "abandoned any claim of special interest in regulating the distribution of unauthorized leaflets or the delivery of campaign speeches for political candidates within the confines of the military reservation." Id. at 837, 96 S.Ct. at 1217. The Court noted that this selective restriction against political campaigning was reasonable because it was "wholly consistent with the American constitutional tradition of a politically-neutral military establishment under civilian control." Id. at 839, 96 S.Ct. at 1218. Accordingly, it held that the regulations on their face did not violate the plaintiff's constitutional rights.
 
 
 12
 Finally, in Albertini, 472 U.S. 675, 105 S.Ct. 2897, the Supreme Court was confronted with a situation where a defendant had been prosecuted for attending a military open house at Hickam Air Force Base and participating in a peaceful demonstration against the arms race in violation of a bar letter that previously had been issued against him. Although the holding of the case was that Albertini could be excluded from Hickam AFB even if it were a public forum because of his prior criminal conduct, the Court went on to criticize the suggestion that Hickam had become a public forum during the open house. The Court stated "there is 'no generalized constitutional right to make political speeches or distribute leaflets,'.... on military bases, even if they are generally open to the public." Id. at 685, 105 S.Ct. at 2904 (quoting Greer, 424 U.S. at 838, 96 S.Ct. at 1217). The Court went on to state even more specifically, "[n]or did Hickam become a public forum merely because the base was used to communicate ideas or information during the open house." Id. 472 U.S. at 686, 105 S.Ct. at 2904 (emphasis added).
 
 
 13
 The Eighth Circuit Court of Appeals similarly concluded that Offutt Air Force Base did not become a public forum during its open house. Persons for Free Speech at SAC v. United States Air Force, 675 F.2d 1010 (8th Cir.) (en banc), cert. denied, 459 U.S. 1092, 103 S.Ct. 579, 74 L.Ed.2d 939 (1982). Offutt AFB held an annual open house at which time the public was invited to come on the base. The open house had been attended by as many as two-hundred fifty thousand people, and it included displays of military equipment, military bands, and many non-military organizations (including defense contractors, local public service organizations, and public safety organizations) who were assigned display booths. The petitioners sought permission for a booth to advocate anti-war beliefs, and their request was denied because the Air Force precluded political or ideological speech on base. The Eighth Circuit upheld this restriction, holding that the open house activities did not convert Offutt Air Force Base into a public forum and that the restrictions against political speech on an air force base were reasonable. Accordingly, the Eighth Circuit rejected the petitioners' claim that the First Amendment entitled them to the right to present their view at the open house.
 
 
 14
 Applying the preceding precedents to the undisputed facts in this case lead to a clear conclusion that Peterson AFB was not opened as a public forum to political and ideological speech during its open houses. As noted in the panel decision, the Air Force Chief of Staff, General Larry Welch, stated that "an 'open house' event was never intended to function as an open political forum for the discussion and debate of the important and sometimes divisive political questions of the day ..." R. Vol. I, Doc. 9, Tab 3, p 8 (Affidavit of Larry D. Welch). See also Affidavit of Base Commander Colonel James O. Palmer, R. Vol. I, Doc. 9, Tab 1 at 3 (in creating open houses, the Air Force did not create a forum for debating political or ideological topics). Colonel Palmer went on to state in his affidavit that Peterson AFB had consistently denied all requests to discuss political and ideological subjects on base. Among the petitions that have been denied at Peterson AFB are the following: "Petitions aimed at advocating a no smoking law; putting political pressure on the Soviet Union to leave Afghanistan; creating an Olympic Hall of Fame in Colorado Springs; opposing an atheists' petition before the Federal Communications Commission to stop religious broadcasting; requiring tax increases to be approved only by a vote of the people; and declaring English the official language of Colorado." Id. at 2.[2] Appellees introduced no contrary testimony disputing the Air Force policy of precluding political or ideological speech.
 
 
 15
 Appellees would have us turn, instead, to an objective analysis of the actual activities and conduct that were permitted at Peterson AFB during its open houses in order to infer whether the Air Force intended to open the base to political and ideological speech.[3] We did include such an analysis in our previous panel decision, and we do so again now. The parties stipulated as to the activities that occurred during the open houses, so there is absolutely no dispute of fact on that matter. The following is a complete summary of the stipulated activities that occurred during the open house events: (1) Air Force recruiting; (2) discussion by defense contractors concerning their weapon systems currently in use by the Air Force; (3) distribution of circulars advertising the Cheyenne, Wyoming Year-Round Walk and advertising the Historic MacGregor Ranch Walk in Estes Park, Colorado; (4) distribution of one edition of a newspaper entitled the "Space Observer"; and (5) a brochure about the International Plastic Modelers' Society. There were also various aerial shows, bands, a NORAD ceremony, and military reviews, all performed by military personnel. In addition, one of the plaintiffs attending the Guest Day received the following from military representatives of the base Chaplain: (1) an invitation to the Peterson AFB Chapel to attend a luncheon and religious lecture; (2) a book entitled, "About Being Catholic"; (3) a newspaper entitled "The Catholic Herald"; (4) a copy of The Good News Testament Bible that contained the inscription "presented by the Air Force". None of these activities were political or ideological in nature, and the absence of any political or ideological speech strongly corroborates the direct testimonial evidence from Colonel Palmer and General Welch.
 
 
 16
 Appellees specifically focus upon the religious literature that was distributed to one of them during the 1987 open house and they argue that it should be considered to be political and ideological in nature.[4] However, most of these materials consist of little more than information about religious services offered by Peterson AFB to its own Air Force members. That material fits well within the objective of the open house of being informational in nature and describing activities and equipment that are available on base. Appellees refer to the single copy of the Bible which was distributed to one of them and they refer to Matthew 5:38, which counsels not to seek revenge against a wrongdoer, and Romans 13:1, which addresses the godliness of obeying authority. However, the qualitative difference between these general religious statements and a political discussion about current United States policy on the use of military force is obvious. Although one could fashion a connection between any two subjects, no matter how dissimilar they may be, our job is not to fashion abstract connections, but rather to attempt to discern the intent of the Air Force by applying a pragmatic, common sense analysis of the conduct and activities that were allowed (as well as the conduct and activities that were disallowed) during the sponsored open house. This record is absolutely devoid of any evidence, direct or indirect, subjective or objective, testimonial or by conduct, that the Air Force intended to abandon its traditional and long-standing policy of precluding public political and ideological debate during its open house events.[5]
 
 
 17
 There is another response as well to the appellees' argument that the dissemination of religious literature converted the Peterson AFB open house into a public forum. All of the religious materials, including the Bible, were distributed by military personnel--the Peterson AFB Chaplain--and not by civilian members of the public. If the government's own speech could be used to support a claim that it had thereby caused its facilities to become a public forum, then "display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require." United States Postal Service v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 130 n. 6, 101 S.Ct. 2676, 2685 n. 6, 69 L.Ed.2d 517 (1981) (quoting Lehman, 418 U.S. at 304, 94 S.Ct. at 2717). See also Persons For Free Speech, 675 F.2d at 1017-18. The Air Force is free to discuss the religious activities that are available to its base personnel and to allow the base Chaplain to hand out Bibles as an expression of the religious atmosphere available on base without causing the base to become a public forum.[6]
 
 
 18
 Appellees next challenge what they perceived to be the panel's determination that military bases are in a special category for public forum analysis. Appellees suggest that under our panel decision a military base could never be a designated public forum. That is an incorrect reading of our panel decision.
 
 
 19
 It is undeniable that the Supreme Court has stated that military bases are, by their very nature, traditionally nonpublic and that, in determining whether the military has intended to open up a military base to become a public forum, consideration should be given to the resulting loss of control and entanglement in political controversy that would occur if the military base were held to be a public forum. In Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), the Supreme Court affirmed the nonpublic status of Ft. Dix with the following observations: "this Court over the years has on countless occasions recognized the special constitutional function of the military in our national life...." Id. at 837, 96 S.Ct. at 1217. "A necessary concomitant of the basic function of a military installation has been the 'historically unquestioned power of [its] commanding officer summarily to exclude civilians from the area of his command'." Id. at 838, 96 S.Ct. at 1217. In Albertini, the Supreme Court was disinclined to extend public forum status to Hickam Air Force Base, notwithstanding the public activities allowed during its open house events. The Court said: "A military base ... is ordinarily not a public forum ... even if it is open to the public," 472 U.S. at 684, 105 S.Ct. at 2904, "... [n]or did Hickam become a public forum merely because the base was used to communicate ideas or information during the open house." Id. at 686, 105 S.Ct. at 2905. In Kokinda, the Court similarly advised that "[c]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the government's interest must be assessed in light of the characteristic nature and function of the particular forum involved." 110 S.Ct. at 3122 (quoting Heffron v. Int'l Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 650-51, 101 S.Ct. 2559, 2565-66, 69 L.Ed.2d 298 (1981)). And, in Cornelius, the Court said:
 
 
 20
 In cases where the principal function of the property would be disrupted by expressive activity, the Court is particularly reluctant to hold that the government intended to designate a public forum. Accordingly, we have held that military reservations, Greer v. Spock, and jailhouse grounds, Adderly v. Florida [385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) ] do not constitute public fora.
 
 
 21
 473 U.S. at 804, 105 S.Ct. at 3450.
 
 
 22
 The United States Courts of Appeals have also frequently commented on the special need of the military to retain control over the content of public speech permitted on military bases. Frequently, Courts of Appeal have rejected claims that military bases have become public fora because selected public activities and speech have been permitted to occur on base. See Shopco Distribution Co., Inc. v. Commanding General, 885 F.2d 167, 172-73 (4th Cir.1989); United States v. McCoy, 866 F.2d 826, 832-34 (6th Cir.1989); M.N.C. of Hinesville, Inc. v. United States Dept. of Defense, 791 F.2d 1466, 1472-74 (11th Cir.1986); Persons For Free Speech, 675 F.2d at 1015-18.
 
 
 23
 This is not to say that a military base, or a portion of such a base, can never become a public forum. To the contrary, if the evidence clearly supports a conclusion that the military intended "to abandon" control over public conduct or speech on the base or on a portion of a base, then that portion of the base could be deemed to be a public forum. The only case where the Supreme Court has held that a portion of a military base was a public forum was the case of Flower v. United States, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972). There, the Court held that the military had "abandoned any claim that it has a special interest in who walks, talks, or distributes leaflets on [new Branfels Avenue]," which is a street that runs through Ft. Sam Houston. Id. at 198, 92 S.Ct. at 1843. The street essentially had been opened up to unrestricted and unsupervised public access, and the Court held, accordingly, that it had become a public forum. Lest Flower be interpreted too broadly as precedent for declaring military facilities as public fora, the Supreme Court later limited that case to its "unusual facts." See Albertini, 472 U.S. at 685, 105 S.Ct. at 2904, and Greer, 424 U.S. at 836, 96 S.Ct. at 1216. In Greer, the Court instructed that Flower should be read very narrowly, stating:
 
 
 24
 The Court of Appeals was mistaken, therefore, in thinking that the Flower case is to be understood as announcing a new principle of constitutional law, and mistaken specifically in thinking that Flower stands for the principle that whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a 'public forum' for purposes of the First Amendment. Such a principle of constitutional law has never existed, and does not exist now.
 
 
 25
 424 U.S. at 836, 96 S.Ct. at 1216.
 
 
 26
 Thus, when we noted in our prior panel decision that courts have been reluctant to extend public forum status to military bases, we did not propose any special test for military bases. Rather, we simply recognized the reality of existing precedent. In all cases, whether military bases are involved or not, the test is simply whether the government has intended to open up the facility to public debate on the particular subject matter sought to be addressed by the person seeking access to that government facility. When the government facility is a military base, the evidence cannot be considered in a vacuum. Rather, we must consider the evidence against the background of the traditional need of the military to retain control over the scope and extent of public activity and speech permitted on the military base. We must be sensitive to the need of the military to maintain security over the base. Finally, we must keep in mind the traditional role of the military to avoid becoming embroiled in politics and ideological debate. The appellees argue that our holding will restrict free speech, but, in reality, the greater restriction would occur if we were to adopt the appellees' position. Here, the appellees were still free to advocate their own views of pacifism on the public streets immediately leading into Peterson AFB and they had access to the many other public fora within the immediate vicinity of Peterson AFB to reach the public that visited there during the open houses.
 
 
 27
 If appellees' position were adopted, the flow of information to the public from Peterson AFB would likely be restricted. The military, most likely, could not risk the possibility that Peterson AFB would be labeled as a public forum. Affidavit of Larry D. Welch, R. Vol. I, Doc. 9, Tab 3, p 11. Consequently, the Air Force would have to consider possibly abandoning altogether the practice of hosting open house events. Thus, it is possible that the public would lose the opportunity to come onto military bases; to learn about the weapon systems, activities and facilities that are there; and then to take that information back out to the public fora that are available and there to debate, if they wish, the proper role of the military.
 
 
 28
 For the reasons stated, we affirm our prior panel decision, which REVERSES the district court's July 20, 1988 Judgment.
 
 
 29
 JOHN P. MOORE, Circuit Judge, dissenting, with whom HOLLOWAY, Chief Judge, and McKAY and SEYMOUR, Circuit Judges, join:
 
 
 30
 Ignoring Emerson's caution that a "foolish consistency is the hobgoblin of little minds,"[1] I adhere to my previous dissent. Brown v. Palmer, 915 F.2d 1435, 1445 (10th Cir.1990). Taking the lead of the majority, I will not reiterate what I have said before, but given the course of this matter, I must comment further. Nothing contained in the additional presentations by the parties nor the opinion of the majority dissuades me from my original conviction that the district court properly concluded the open houses conducted in 1985 and 1986 were public forums.
 
 
 31
 The source of my disagreement, as noted in my previous dissent, is over the way the majority looks at the evidence. I place greater reliance upon what activities the Air Force permitted rather than what activities it prevented. I believe that when one looks at the actions of the Air Force on the days of the open houses one sees clear evidence of its intent to create a public forum. Although the facts in the record are spare, they are sufficient to determine, as did the trial court, the Air Force intended to allow private citizens to distribute literature advertising their private interests. The evidence is also sufficient to establish those private interests were totally foreign to the military mission of the open houses. To me, those facts indicate the Air Force intended to permit the base to be open to public discourse on civilian activity. Furthermore, the only difference between those civilians who were permitted to advertize their private interests and plaintiffs was the Air Force did not believe the material the plaintiffs wanted to distribute was politically neutral.
 
 
 32
 To me, it is not significant that some might consider the material circulated by those individuals to be bland or uncontroversial. What is significant is those persons were allowed to speak on subjects of their own choice which were entirely foreign to the military mission of the open house. Contrary to the majority, I do not believe the government can create a limited public forum. Once private discourse is encouraged or allowed in a governmental facility, that locus has become a forum for the free exchange of all ideas.
 
 
 33
 Thus, the issue here is not whether the government can selectively regulate the speech of citizens on a military base, but whether, after creating a public forum on that base, it can exercise the power of censorship. In my view, the majority is trying to have the cart draw the horse. The majority concludes the Air Force did not intend to create a public forum at the open houses because the Air Force can and did lawfully regulate speech on the air base. That analysis decides the public forum issue upon a determination of what speech was disallowed at the open house rather than what speech was permitted. I think the proper method of analysis is to first determine the type of forum provided by the Air Force and then decide whether that forum will permit censorship of speech.
 
 
 34
 Additionally, the majority narrows the forum issue to whether the Air Force intended to create a forum for "political or ideological debate." I believe that blurs the focus of this case. If a public forum was created by the actions of the government, by definition it is open to political, ideological, or any other forms of discourse. That fact distinguishes the cases upon which the majority relies.
 
 
 35
 In Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court reminds us:
 
 
 36
 In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939). In these quintessential public forums, the government may not prohibit all communicative activity....
 
 
 37
 A second category consists of public property which the State has opened for use by the public as a place for expressive activity. The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum....
 
 
 38
 Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.
 
 
 39
 460 U.S. at 45-46, 103 S.Ct. at 954-55 (citations omitted).
 
 
 40
 We may therefore conclude with assurance there are three types of public property within which the government has differing powers of censorship. The first are streets, parks, and other facilities which are intended for public assembly. The government's right to limit speech in these facilities is confined to narrowly drawn regulations necessary to serve a compelling state interest. Id. at 45, 103 S.Ct. at 954; Flower v. United States, 407 U.S. 197, 198, 92 S.Ct. 1842, 1843, 32 L.Ed.2d 653 (1972) (military cannot prohibit distribution of literature on "completely open street").
 
 
 41
 The second are facilities which are not by their nature intended for public assembly but, through governmental action, are opened for that purpose. As the Court noted in Perry, to the extent the government allows those facilities to remain open "it is bound by the same standards as apply in a traditional public forum." 460 U.S. at 46, 103 S.Ct. at 955.
 
 
 42
 Finally, there are those facilities which are not opened for public assembly by either tradition or governmental action. In those facilities, the government can reasonably regulate speech. Id. Thus, the dimensions of the government's rights to control the content of speech are measured by "the nature of the relevant forum." Cornelius v. NAACP Legal Defense and Educ. Fund, Inc., 473 U.S. 788, 800, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985).
 
 
 43
 In the cases relied upon by the majority to support its conclusion that the Air Force could deny plaintiffs the right to speak, the Court held the public facility in which speech was governmentally regulated was of the third category: not a public forum. In Perry, the Court concluded the school district mailboxes were not a public forum. 460 U.S. at 46, 103 S.Ct. at 955. In Lehman v. City of Shaker Heights, 418 U.S. 298, 303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974), the Court held advertising placards on public conveyances were not a public forum.[2] In Greer v. Spock, 424 U.S. 828, 838, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976), the Court held that merely because a military base was open to visitors it had not become a public forum to permit plaintiffs to make "political speeches or distribute leaflets."
 
 
 44
 In United States v. Albertini, 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985), the question was whether the First Amendment would prevent the conviction of a person subject to a bar letter for the crime of unlawfully entering a military base during an open house. The Court did not decide whether the open house was a public forum, but ruled: "Where a bar letter is issued on valid grounds, a person may not claim immunity from its prohibition on entry merely because the military has temporarily opened a military facility to the public." Id. at 687, 105 S.Ct. at 2905.
 
 
 45
 In United States v. Kokinda, --- U.S. ----, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), the issue was whether the post office could prohibit the solicitation of contributions on a sidewalk between the parking lot and the post office building. Engaging in the forum analysis, the Court determined the sidewalk from the postal parking lot was not the same type of public thoroughfare as a sidewalk which parallels a public street. Whereas the latter is a "public passageway," id. 110 S.Ct. at 3120, the parking lot sidewalk leads only from the lot to the post office front door. Thus, the Court concluded, the post office could regulate the content of speech on that sidewalk, but only because it did not constitute a public forum.
 
 
 46
 Finally, in a case similar to this, the Eighth Circuit concluded an Air Force open house did not constitute a public forum; therefore political speech could be banned. Persons for Free Speech at SAC v. United States Air Force, 675 F.2d 1010 (8th Cir.1982). I do not find Persons antithetical to my analysis, however. First, if the facts of a case do not indicate an intent on the part of the government to create a public forum on the occasion of a military open house, the government has the right to reasonably regulate the content of the speech at that event. Second, the facts of Persons are immediately distinguishable from the facts of this case.
 
 
 47
 The open house involved in Persons did not include advertising or pamphleteering by private persons advocating private interests. The only nonmilitary people engaged in any form of speech were defense contractors who were present, much the same as in this case, to explain the "aircraft and weapon system that they were currently supplying to the Air Force." Id. at 1013-14. None of these contractors were permitted to promote their "consumer products or public relations material regarding their corporations." Id. at 1014. Here, however, during the 1985 and 1986 open houses, private persons unaffiliated in any way with the Air Force were permitted to distribute material relating to, and talk about, their own private interests. I regard that distinction as highly relevant in the forum analysis.[3]
 
 
 48
 Given the legal perspective of the Supreme Court's treatment of governmentally owned facilities and the government's power to regulate the content of speech within those facilities, there is only one conclusion that can be drawn. The government's right to reasonably regulate speech is entirely dependent upon whether the facility is open, by design or designation, to public discourse. Here, because on the occasions of the 1985 and 1986 open houses at Peterson Air Force Base the base was turned into a public forum, the bar letters issued to plaintiffs were prohibited by the First Amendment.
 
 
 49
 As a final comment, I must state that I do not believe a holding in accordance with my view would imperil the future of military open houses. While the majority expresses this concern, it can be easily avoided if, in the future, the command at Peterson Air Force Base will refuse to permit any form of private speech at its open houses.
 
 
 
 [1]
 We will not repeat our analysis of the proper standard of appellate review, nor we will repeat our analysis of the viewpoint-neutral nature of the Air Force's restrictions on the speech permitted during its open houses. These matters are discussed at length in our panel decision at pages 1441 and 1444-45, respectively. We would, however, add to our analysis of the proper standard of appellate review only the observation that this matter comes before us upon the district court's ruling on cross-motions for summary judgment upon a record of largely stipulated and undisputed facts. Thus, in addition to the fact that we are reviewing a legal issue with First Amendment implications, see Brown v. Palmer, 915 F.2d at 1441, the procedural context of the case also warrants our de novo review. Gonzales v. Millers Cas. Ins. Co., 923 F.2d 1417, 1419 (10th Cir.1991)
 
 
 [2]
 Colonel Palmer further stated in his affidavit that his policy is to require prior approval before any written material is distributed on base, and that also applies to material distributed during the open house
 
 
 [3]
 Appellees seem not to have a clear idea of what they are trying to prove from such "objective" evidence. At one point they argue that allowing distribution of a Bible showed that "the Air Force certainly intended, though unwittingly, to open the base up to a wide exchange of ideas on the day in question." Appellees' brief at 15 (emphasis added). However, Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449, makes it clear that a nonpublic forum cannot be transformed into a public forum unwittingly or by inaction. Rather, it can only be accomplished "intentionally."
 
 
 [4]
 The record on appeal does not demonstrate that the distribution of religious material during the 1987 open house was ever linked to the activities of the 1985 and 1986 open houses, which are the open houses under scrutiny in this case. We nevertheless discuss the distribution of religious materials because both parties address the issue on appeal without challenge to the assumption that similar material was disseminated during the 1985 and 1986 open houses, and the district judge similarly made reference to this material in his opinion. However, insofar as the appellate record is concerned there is nothing to establish that religious materials were distributed during the 1985 or 1986 open houses
 
 
 [5]
 Ironically, even the very limited distribution of religious material by the base chaplain that did occur during the open house appears to have been inadvertent and unauthorized. Palmer affidavit. R. Vol. I, Doc. 9, Tab 1, p. 3
 
 
 [6]
 Opening up an air force base to the distribution of literature of one religion to the exclusion of other religions might raise other constitutional questions but no such issue is before us in this case
 
 
 [1]
 Ralph Waldo Emerson, Essays: First Series (1841) History
 
 
 [2]
 The Court also considered the commercial nature of the advertising enterprise as a further reason to allow the government to choose what speech it would permit. "In much the same way as a newspaper or periodical, or even a radio or television station, need not accept every proffer of advertising from the general public, a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles." Lehman, 418 U.S. at 303, 94 S.Ct. at 2717
 
 
 [3]
 Contrary to the position taken by the plaintiffs, I do not regard the defense contractors any differently than the military personnel who were conducting recruiting activities. In the context of their function, those contractors were carrying out the military mission of the Air Force by providing the public information about the weaponry on exhibit