Linda K. TINKLER; Jason P. Tinkler, a minor, by his parent and guardian, Linda Tinkler, and James E. Tinkler, IV, a minor, by his parent and guardian, Linda Tinkler, Plaintiffs–Appellants,

v.

UNITED STATES of America, acting by the FEDERAL AVIATION ADMINISTRATION, Defendant–Appellee.

No. 89–3105.

United States Court of Appeals, Tenth Circuit.

Dec. 30, 1992.

---

John W. Lungstrum of Stevens, Brand, Lungstrum, Golden & Winter, Lawrence, KS (Winton A. Winter, Jr. and Scott J. Bloch, with him on the brief), for plaintiffs-appellants.

James C. Wilson, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C. (Stuart M. Gerson, Asst. Atty. Gen., Benjamin L. Burgess, Jr., U.S. Atty., and Janice Miller Karlin, Asst. U.S. Atty., with him on the brief), for defendant-appellee.

Before McKAY, Chief Judge, and HOLLOWAY and McWILLIAMS, Circuit Judges.

HOLLOWAY, Circuit Judge.

This is an appeal from a judgment against the plaintiff-appellant, Mrs. Tinkler, who brought suit individually and as parent and guardian of her two children. The action was maintained under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b), alleging negligence by a Federal Aviation Administration (FAA) employee for his acts and omissions in connection with his duty to furnish weather information to the pilot of an aircraft in which Mr. Tinkler was a passenger. Mrs. Tinkler maintains that the crash of the aircraft and deaths of the pilot and Mr. Tinkler, her husband and the father of her minor children, were the proximate result of the government's negligence.

Following trial to the court, the district judge entered findings of fact, conclusions of law, and a judgment adverse to the plaintiffs. *Tinkler v. United States of America by Federal Aviation Administration,* 700 F.Supp. 1067 (D.Kan.1988). A motion to alter or amend the judgment was filed and the trial judge denied this motion by an unpublished order. A timely notice of appeal followed.

I

On April 25, 1985, Mr. Tinkler was flown from Hill City, Kansas, where he lived, to Dodge City, Kansas, by Leigh Crotts in Piper Comanche number N8852P. He was to be flown back to Hill City later that day by Larry Cunningham, an instrument rated pilot with over 5,000 hours of flight experience.

The flight to Dodge City had been made under Visual Flight Rules (VFR). Cunningham and Tinkler departed Dodge City at 8:36 p.m., and Cunningham had planned to fly VFR back to Hill City. Cunningham was, however, certified to fly under conditions requiring Instrument Flight Rules (IFR) if necessary, and the aircraft was equipped with the proper equipment for IFR flight. *See* 700 F.Supp. at 1069. Prior to takeoff, Cunningham contacted the Dodge City Flight Service Station (FSS) and the Air Traffic Control Specialist (ATCS) on duty, Kludas Mead (Mead), gave Cunningham the airport advisory and present altimeter setting, but did not provide Cunningham with a weather briefing or advise him of any adverse weather in the area forecast.

The Dodge City FSS had a published closing time of 9:00 p.m. At 8:55:58 p.m. CST (0255:58 GMT (Greenwich Mean Time)), Cunningham contacted the FSS and stated to Mead: "Uh for [sic] you get out of there, you got any weather up in the Hill City area?" Mead told Cunningham that the weather data had been "put away"

because the FSS was closing and that any data he had would have been "an hour old anyway." Mead suggested that Cunningham contact the Wichita FSS, which was a 24 hour station, for a weather update.[1] About one minute later, Mead tried to contact Cunningham again, but could not. In his deposition, Mead said he had a "notice to airmen," which was not explained, and that he wanted to advise Cunningham there was an additional frequency in the Hill City area. I R.Doc. 141 at 66.

In fact, Mead had available the latest weather data from Hill City, because the Hill City weather observation station is not a 24 hour station and the 7:49 p.m. Surface Observation there (which Mead had) was the last one sent to any FSS that day. That Surface Observation was available through the Dodge City FSS computer in a matter of seconds. The 7:49 p.m. Hill City Surface Observation noted that the weather had deteriorated from what it was during the flight to Dodge City: The conditions at Hill City were unstable, with a 600 foot cloud ceiling and fog. Therefore, at 7:49 p.m. Hill City was experiencing IFR conditions. *See* 700 F.Supp. at 1070. However, an instrument landing at Hill City would have been impossible, because the Hill City Airport is not set up for IFR operations.

The record contains no evidence as to whether Cunningham contacted any other FSS. The trial judge found that the events that transpired from the time of the communication with Mead, mentioned above, until a few minutes before the crash are speculative. 700 F.Supp. at 1072. Near WaKeeney, which is located between Dodge City and Hill City, the broken clouds began to thicken into a solid overcast cloud layer. The remainder of the facts in this case appear from evidence such as the amount of gas estimated to be remaining in the aircraft and one sighting and some hearings of the aircraft by observers on the ground.

The cloud base began to descend closer to the ground just south of WaKeeney.

Cunningham was flying the aircraft at an extremely low altitude. Some witnesses heard a plane flying at a low altitude and one witness, Weller, saw a plane approximately 10 miles south of WaKeeney flying at approximately 500 feet AGL (above ground level). 700 F.Supp. at 1072. Just north of the WaKeeney airport, there was heavy ground fog and rising terrain.[2] In that vicinity the plane crashed while being flown at a slight downward angle. It burned and both Cunningham and Tinkler were killed.

The district court found, *inter alia*, that Mead had breached a duty to respond to Cunningham's request for weather information. The court also found, however, that Cunningham's conduct constituted extreme, gross, extraordinary, and unforeseeable negligence. Cunningham's conduct was held to be not only an intervening cause but also a superseding cause of the crash; the FAA's negligence was held to be remote and not directly linked to the crash and not a legal or proximate cause of the crash. 700 F.Supp. at 1073–76.

This appeal followed. The plaintiffs argue that the trial court erred in the application of Kansas law on proximate cause and foreseeability, and that it was error to hold that the FSS employee's actions were not a legal or proximate cause of the accident. The government responds that the findings and conclusions of the trial judge in its favor on liability were correct. Further, the government says that the judge erred in holding that Mead breached the duty to respond to Cunningham's request for weather information. In connection with that argument the government, apparently for the first time on appeal, makes a brief assertion of the discretionary function exception, 28 U.S.C. § 2680(a), in connection with the closing down procedure of the Dodge City FSS facility. Brief of the United States at 47.

II

■ Before argument of this appeal, on our own motion we requested that the par-

---

1. For the transcribed content of this dialogue, see Part III, *infra*.

2. Near WaKeeney, the cloud level was approximately 100 feet AGL. *See* 700 F.Supp. at 1070.

ties file memoranda addressing the sufficiency of the notice of appeal, as it was worded, to support appellate jurisdiction of the claims asserted on behalf of the minor children in light of the Supreme Court's decision in *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988).

The notice of appeal in the instant case was captioned "LINDA K. TINKLER, et al., Plaintiffs, v. UNITED STATES OF AMERICA, acting by the Federal Aviation Administration, Defendant." The body of the notice stated in part that "plaintiffs hereby give notice of their appeal ... from this Court's Memorandum and Order dated November 23, 1988, and this Court's Memorandum and Order dated March 30, 1989, entering judgment against plaintiffs on behalf of defendant and denying plaintiffs' Motion to Alter or Amend the Judgment." The notice was signed by counsel described as "Attorneys for Plaintiffs." II R.Doc. 175. In its memorandum brief addressing the notice of appeal, the government recognizes that the question here is somewhat different from that in *Torres*, but argues that the *Torres* holding applies with equal force here and that the descriptive "et al." did not give fair notice of the identity of all the parties taking the appeal.

We disagree. In *Torres* the party asserting the right to appeal had not been named in the notice of appeal and he relied on the "et al." designation in the notice. The Court held that where that party was not named in the notice filed by the fifteen other intervenors, reliance on the Latin phrase was misplaced. The vague designation did not serve the purpose of providing notice to the opposition and the court of the identity of the appellants. 487 U.S. at 317–18, 108 S.Ct. at 2409.

The instant case is distinguishable. In *Torres* the party asserting the right to appeal was one of sixteen *individual* plaintiffs who had intervened. They were suing in their individual capacities. *Id.* at 313–14, 108 S.Ct. at 2407. On the other hand, here

the mother, Linda Tinkler, was suing in both her capacity as an individual and as the parent and guardian of Jason P. Tinkler and James E. Tinkler, IV. I Supp. R.Doc. 1. We are convinced that *King v. OTASCO, Inc.*, 861 F.2d 438 (5th Cir.1988), applies here, disposing of the government's argument. There a notice of appeal filed by a father similarly did not name his children in the notice, but, as here, the children had not sued as independent parties. King sued individually and as their representative and next friend, *id.* at 443, just as Mrs. Tinkler here sues both in her own right and as the parent and guardian of her children. King's appeal was held valid and the court held that it had jurisdiction over the appeal as it related to King's children.

Here we likewise feel that the validity of the notice of appeal to cover the children's interests is clear. The references in the instant notice of appeal, such as the "et al.," the description of the statement that "plaintiffs" gave notice of appeal, and the statement that the appeal was from a judgment "against plaintiffs," and that counsel was the attorney "for plaintiffs," all point plainly to the appeal being prosecuted by Mrs. Tinkler both in her individual and representative capacities. Moreover, the reference in the notice of appeal to the judgment against the plaintiffs and to the order denying plaintiffs' motion[3] further gave fair notice to the government, since the judgment and the pleading covered the interests of the mother and the children. And importantly, the memorandum brief of the government addressing *Torres* makes no claim or showing of any misunderstanding by the government as to the appeal being prosecuted by Mrs. Tinkler in both capacities, or of any prejudice to the government by the appeal going forward for the minor children's interests along with that of their mother.

We are convinced that the *King* holding should be applied here. *King* has been followed by us where the question raised about a notice of appeal dealt only with the

---

**3.** Furthermore, that motion bore the same caption as did the original case, rather than "et al." This suggests that Mrs. Tinkler intended all of her appeals to be made in all three capacities, rather than in her name only.

*capacity* in which a party was appealing. *See Brown v. Palmer,* 915 F.2d 1435, 1439–40 (10th Cir.1990), *panel opinion upheld on other grounds,* 944 F.2d 732 (10th Cir. 1991) (*en banc*). Accordingly, we conclude that the notice of appeal here validly conferred appellate jurisdiction on this court to hear the appeal of Mrs. Tinkler in her individual capacity and in her capacity as parent and guardian of her children.

### III

It is convenient to consider next the trial judge's findings of government negligence based on the acts and omissions of FSS Specialist Mead.[4]

### A.

■ The government begins by claiming that the guidelines for FSS personnel contained in the *Flight Services Manual* have the force of neither statutes nor regulations and hence that violations of those guidelines are not necessarily negligence. However, the characterization of the guidelines contained in the manual is not dispositive of the negligence issue. The district court correctly found that Mead had a duty to respond to Cunningham's request for weather information. Mead's duty arose from both the dictates of the *Flight Services Manual* as well as the reliance pilots place on FSS briefers. This finding is supported by the record in this case as well as by case law. *See Moorhead v. Mitsubishi Aircraft International, Inc.,* 828 F.2d 278, 282 & nn. 13–14 (5th Cir.1987); *Gill v. United States,* 429 F.2d 1072, 1075 (5th Cir.1970); *Tinkler,* 700 F.Supp. at 1074 (Finding 12, collecting cases).

■ Citing the proposition that "one is not obligated to anticipate another's negligence," Brief of the United States of America at 46 n. 16, the government next argues that Mead was entitled to assume that Cunningham would follow all applicable Federal Aviation Regulations (FARs). While this

argument has some force, it does not in any way undermine the finding that Mead was negligent. As we discuss later, if the first actor was negligent and the second actor's further negligent conduct was foreseen or reasonably should have been foreseen, the first actor is not relieved of liability.

The government further argues that the *Flight Services Manual* does not specifically cover what to do when a pilot makes a request for weather information minutes before a station's scheduled closing. It says that Mead fulfilled the directive of the manual's foreword to "exercise [his] best judgment" in a situation not covered by the manual. *See* Brief of the United States of America at 47–48. We are not persuaded. If one construes the manual in such a narrow manner, it does not even tell an FSS operator how to handle requests that come in the *middle* of published hours, let alone at the beginning or end. We assume that the promulgators of the manual intended its directives, when they do not speak to specific times, to be followed during *all* published hours of operation rather than until just before "quitting time." However, we do note that even if we assume that this particular situation was governed by the foreword, that directive gave Mead quite enough room to have provided Cunningham with the Hill City surface observation, which at least would have alerted Cunningham to the need for further updates.

Finally, Gerald Smith, the government's FSS expert, testified that Mead would have been prohibited by the *Flight Services Manual*'s directives from complying with Cunningham's request. Smith opined that paragraph 168 required Mead to give a full briefing in all circumstances, and that since the information required for such a briefing had been put away, Mead could not give *any* briefing if he couldn't give a full one.[5] *See* V R. at 804–05. However,

---

4. The plaintiffs-appellants contend that we should not consider the alternative arguments for affirmance treated in this Part III because the government took no cross-appeal. However, an appellee "may defend the judgment won

below on any ground supported by the record without filing a cross-appeal." *In re Robinson,* 921 F.2d 252, 253 (10th Cir.1990).

5. Again, even if this were true, the government's own earlier argument would then require that

Smith's statements simply do not comport with the text of the *Flight Services Manual.*

Paragraph 168 of the *Flight Services Manual* directs the briefer to "[p]rovide an abbreviated briefing ... when the pilot requests that the briefing be limited to specific information." *See* I R.Doc. 141, Ex. 44 ¶ 168. Cunningham made just such a specific request for "any weather up in the Hill City area." 700 F.Supp. at 1071. The only part of paragraph 168 which is relevant to Cunningham's request is subpart a. It directs the FSS briefer that

> When a pilot desires specific information only, provide the requested information. If adverse conditions are present or forecast, advise the pilot of this fact. Provide details on these conditions in accordance with paragraph 167(b)(1) [Conduct of Standard Briefing] *if the pilot requests that you do so.*

I R.Doc. 141, Ex. 44 ¶ 168(a) (emphasis added). Contrary to Smith's assertions at trial, this language does *not* require a standard briefing in all cases. Rather, it requires that the briefer first give the pilot the information that he or she asked for, and then inform the pilot of adverse conditions. Recourse is made to paragraph 167(b)(1) *only* if the pilot then asks for further details on those adverse conditions. Moreover, paragraph 167(b)(1) does not require a full standard briefing, but only dictates the type of information to be provided in the part of a standard briefing that relates to "Adverse Conditions." I R.Doc. 141, Ex. 44 ¶ 167(b)(1).

In short, the government has not demonstrated any reasons for disturbing the district court's findings that Mead both had a duty to respond to Cunningham's request and that he breached that duty.

## B.

█ Within its argument for reversal of the findings of negligence by FAA Specialist Mead, the government makes a brief contention (treated in substance in one paragraph) based on the discretionary function exception of the FTCA, 28 U.S.C. § 2680(a), apparently suggesting this argument for the first time on appeal. Because the issue is one going to jurisdiction, we will consider the point.

The substance of the argument is that the Dodge City Flight Service Station was a part-time facility which closed at 9:00 p.m. CST; that before closing, Mead had to perform a checklist of tasks, including taking down and storing the weather data and charts; that to close the facility and complete his shift within the time designated by the FAA, Mead had to complete these duties before 9:00 p.m. The government says that the "close-down procedure, the closing time of the facility, and the length of Mr. Mead's shift are discretionary policy decisions and thus immune from suit," citing § 2680(a); *United States v. Varig Airlines,* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), *reh'g denied sub nom. United States v. United Scottish Insurance Co.,* 468 U.S. 1226, 105 S.Ct. 26, 82 L.Ed.2d 919 (1984); and *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988).

We are not persuaded that the argument is relevant to the negligence claim made here by plaintiffs. The trial judge made the following findings of fact concerning the critical conversation between Mead and Pilot Cunningham:

> 21. At 8:55:58 p.m. CST, 0255:58 GMT, Pilot Cunningham contacted Specialist Mead by radio at the Dodge City Flight Service Station (DDC FSS). The following conversation occurred:

| TIME | PERSON SPEAKING | CONVERSATION |
|------|------|------|
| 0255:58 | N8852P | Dodge City Radio Comanche eight eight five two pop uh you still down there? |

the situation be governed by the manual's foreword. As stated before, that would have permitted Mead to advise Cunningham that the last

report from Hill City listed IFR conditions and would have put Cunningham on notice that he probably could not land at Hill City.

| | | |
|---|---|---|
| 0256:06 | DDC FSS | Eight eight five two pop go ahead. |
| 0256:08 | N8852P | Uh for [sic] you get outa there you got any weather up in the Hill City area this evening? |
| 0256:12 | DDC FSS | Why don't ya give Wichita a call on. uh one two two point one, listen on the VOR, see if they can't update ya, everything we've gots already been put away and uh it'd be over one hour old anyway, but uh you can talk to Wichita through the Dodge VOR or the Hays or the Hill City. |
| 0256:27 | N8852P | Ok DeWain thank you sir, eight eight five two papa. |
| 0256:30 | DDC FSS | There uh everything (it'd) * be one hour old, they should be able to give ya some current weather here in just a few minutes and they can give ya updates on the uh radar. |
| (0257) | | |
| 0257:48 | DDC FSS | Eight eight five two pop Dodge, you still on the freq? |
| (0258) | | |
| (0259) | | |

---

This in-flight communication from Pilot Cunningham was not made during an emergency situation.

*Tinkler*, 700 F.Supp. at 1071. The judge further found:

> 22. The weather information requested by Cunningham in this communication was available to Mr. Mead through the computer terminal in the Dodge City FSS. The data retrievable from the computer included the 7:49 p.m. surface observation from Hill City and also the area forecast. *Mr. Mead could have accessed this information in a few seconds.*

*Id.* at 1071 (emphasis added).

It is undisputed that the crucial dialogue, quoted above, occurred some four minutes before the closing time of the station. The trial judge made the following finding and conclusion addressing plaintiffs' claims of government negligence and omission:

> 13. Specialist Mead, at the Dodge City FSS, breached the duty to respond to Pilot Cunningham's request for weath-

er information. Cunningham made a direct request for weather in the Hill City area. Mead had this information available at the time of the request. Specifically, Mead could have accessed information on the Hill City surface observations and area forecast from the computer terminal, which was still functioning at the time of Cunningham's request. Instead of directly responding to Cunningham's request, Mead directed Cunningham to contact the Wichita Flight Service Station for this information.

*Tinkler*, 700 F.Supp. at 1074.

Clearly Mead could have responded, as the trial judge found, by accessing the critical Hill City surface observation and the area forecast rapidly on his computer and giving it to Cunningham promptly.[6] In fact, as the trial judge noted, "[a] weather observer at Hill City had reported IFR weather conditions at 7:49 p.m." Finding 13, *Tinkler*, 700 F.Supp. at 1070. Such a rapid and brief response would not have

* This portion of the recording is not clear, but represents the best interpretation possible. [Footnote from original text.]

6. The record indicates that the information was accessible through the computer almost immediately. Mr. Fred Smoke, the plaintiff's expert on flight service station procedure, testified that all of the relevant information would have been available by typing a few commands on the computer available to Mr. Mead, which had not been turned off as part of the preparation of closing the flight service station. *See* IV R. at 348–49, 354–55.

infringed any policy directives to Mead.[7] Giving such a response with the critical information from the computer about weather in the Hill City area would not have been "conduct that can be said to be grounded in the policy of the regulatory regime." *United States v. Gaubert,* —— U.S. ——, —— 111 S.Ct. 1267, 1275, 113 L.Ed.2d 335 (1991).

The Supreme Court recently reviewed its decisions on the discretionary function exception in *Gaubert.* Concluding that the exception covers only acts that are discretionary in nature and that involve an element of judgment or choice, the Court held:

> The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.' *Berkovitz,* 486 U.S., at 536, 108 S.Ct., at 1958.

> > Furthermore, even 'assuming the challenged conduct involves an element of judgment,' it remains to be decided 'whether that judgment is of the kind that the discretionary function exception was designed to shield.' Ibid. See *Varig Airlines,* 467 U.S., at 813, 104 S.Ct., at 2764. Because the purpose of the exception is to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort,' id., at 814, 104 S.Ct., at 2765, when properly construed, the exception 'protects only governmental actions and decisions based on consider-

ations of public policy.' *Berkovitz,* supra, at 537, 108 S.Ct., at 1959.

*Gaubert,* —— U.S. at ——, 111 S.Ct. at 1273–74; *accord Ayala v. United States,* 980 F.2d 1342, 1350–51 (10th Cir.1992); *Cooper v. American Automobile Ins. Co.,* 978 F.2d 602, 612–13 (10th Cir.1992).

The undisputed facts referred to in the trial judge's findings demonstrate that the discretionary function exception does not apply here. In connection with the first step of the *Berkovitz* test, Mead's conduct did not involve an element of judgment or choice. His duty to respond to Cunningham's request for information was plainly spelled out in the *Flight Services Manual* provisions,[8] requiring him to give a prompt response with the information that was readily available to him, as the trial judge found. Mead had "no rightful option but to adhere to the directive." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958. Further, the government argument fails the second step of the *Berkovitz* test since the judgment Mead exercised concerning his response was in no way "grounded in social, economic, and political policy...." *Berkovitz,* 486 U.S. at 537, 108 S.Ct. at 1959.

We hold that the government's position respecting the discretionary function exception is without merit.

### IV

#### A.

We now turn to the principal arguments of the plaintiffs-appellants for reversal of the judgment against them entered by the trial judge. Their main contentions are that: (1) the government cannot escape liability for the foreseeable consequence of its

---

**7.** We note that an FAA Memorandum to all Regional Directors, dated May 18, 1982, included as Exhibit 51 to Mead's deposition, I R.Doc. 141, stated that air traffic services other than air traffic control and En Route Flight Advisory Service "could be provided outside published hours of operation."

**8.** See *Flight Services Manual,* I R.Doc. 141, Ex. 44 ¶ 170, which provides that the FSS staff shall "[p]rovide the pilot with available meteorological and aeronautical information in accordance with ¶ 167, 168, or 169 as appropriate." Paragraph 168(a) stipulates that: "[w]hen a pilot

desires specific information only, provide the requested information. If adverse conditions are present or forecast, advise the pilot of this fact."

Paragraph 170(a) provides:
a. When a weather advisory is in effect, i.e., WA, WS, WST, CWA, or AWW, which pertains to an area within 150 NM of the aircraft's position, obtain the route and destination if not already known. Deliver the advisory if it is pertinent and the pilot indicates that it has not been received previously.

negligence; the district judge's analysis was flawed because "[n]egligence to be the proximate cause of an injury must be such that a person of ordinary caution and prudence would have foreseen that an injury would likely result therefrom[,] not that the specific injury would result, but an injury of some character," citing *Atchison, Topeka & Santa Fe Ry. Co. v. Parry,* 67 Kan. 515, 73 P. 105, 107 (1903), *inter alia;* (2) the government could reasonably foresee the consequences of its failure to provide weather information and reasonably foresaw that such failure can result in harm; (3) the findings and conclusions that Pilot Cunningham's actions constituted a superseding cause of the accident, merely because his actions were found to constitute gross and wanton negligence, were in error. Plaintiffs request that we reverse and remand for a determination of damages under the comparative fault law of Kansas, Kan.Stat.Ann. § 60–258a (Supp. 1991).

We have earlier outlined the findings and conclusions of the trial judge underlying his ruling. *See Tinkler v. United States,* 700 F.Supp. 1067 (D.Kan.1988). In light of the main appellate contentions made by plaintiffs, the critical findings and conclusions of the trial judge are these: A weather observer at Hill City had reported the IFR weather conditions at 7:49 p.m. on April 25, 1985, the night of the crash; the cloud ceiling at Hill City was reported to be 600 feet AGL, overcast, with five miles' visibility and some fog reported, Finding 13, 700 F.Supp. at 1070; according to the testimony of Dr. Hoxit, a consulting meteorologist, the transition from VFR to IFR weather conditions along the route of the plane's flight was gradual; about 15 miles north of Ness City, scattered low clouds with bases of 2,000 feet AGL started to form; about ten miles south of WaKeeney, overcast skies and IFR weather conditions developed near the ground. The bases of the cloud cover continued to lower until near WaKeeney, where the cloud bases were about 100 to 200 feet AGL. The judge found that because of the gradual transition from VFR to IFR weather conditions, "Pilot Cunningham would have been

able to perceive the deteriorating conditions developing along the flight, and had an opportunity to turn around before entering the IFR weather." Finding 13, 700 F.Supp. at 1070.

We have earlier recited the conversation which occurred, according to the transcript, some four minutes before Mead left the Dodge City FSS. 700 F.Supp. at 1071. We noted that the weather information requested by Cunningham was available to Mead through the computer terminal in the Dodge City FSS, including the 7:49 p.m. surface observation from Hill City, and that Mead could have accessed the information in a few seconds. We have noted the finding of the judge that there was negligence by the Dodge City FSS in failing to fulfill its duty by giving a direct response to Pilot Cunningham's request, instead directing Cunningham to contact the Wichita FSS station. 700 F.Supp. at 1074.

The judge found that Pilot Cunningham had failed to comply with his duty to obtain a preflight briefing on weather information before departing for Hill City, 14 C.F.R. § 91.5. Cunningham did not contact FSS Specialist Mead until he had traveled for almost 20 minutes on the flight to Hill City. Cunningham had a duty to avoid adverse weather conditions. 700 F.Supp. at 1073. The judge found that Cunningham was extremely and grossly negligent in flying around WaKeeney for approximately ten minutes at altitudes from 100 to 200 feet AGL; that he had a duty to use all available weather information; and that when he experienced deteriorating weather, he should have attempted to contact one of various sources of weather information. 700 F.Supp. at 1074.

The judge noted that in a wrongful death action, under Kansas law the decedent is presumed to have exercised due care and to possess the love of life. No evidence was presented to rebut the presumption and the court found no negligence on the part of Mr. Tinkler. Moreover, no claim is made that any negligence of Pilot Cunningham should be imputed to Mr. Tinkler and there is no basis in this record for doing so.

In his conclusions on the legal cause of the crash, the judge held that the negligence of Mead and the Dodge City FSS was not the legal (proximate) cause; the gross negligence of Pilot Cunningham was not only an intervening cause, but was a superseding cause; and that Cunningham's actions cut off the liability of any earlier negligence by the Dodge City FSS. The judge found that the negligent acts of Pilot Cunningham were unforeseen acts of gross negligence; that Mead was not required to foresee negligent or grossly negligent acts of pilots; and that the negligent acts of Cunningham were not foreseen by Mead. The judge held that Pilot Cunningham's negligence in placing his aircraft in a place of peril and flying at extremely low and unsafe altitudes was the legal cause of the crash, for which the government was not liable. 700 F.Supp. at 1075–76.

### B.

■ We must apply the law of Kansas, where the negligent acts or omissions were alleged to have occurred. *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). In this case, federal statutes and regulations prescribe important duties of pilots and FAA personnel, but the basic framework of tort law standards which governs is that of Kansas.

■ As we consider the claims of error of plaintiffs, we note that the main battleground is not over the subsidiary historical facts found by the trial judge. The appellate contentions focus instead on his ultimate findings, such as the legal or proximate cause of the accident. Of course, those findings, like "subsidiary" fact-findings, are subject nevertheless to the rule that findings of fact are not to be set aside unless clearly erroneous. *Pullman–Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). Moreover, although a considerable part of our record is documentary, the clearly erroneous standard still applies in determining whether the findings of fact made by the trial judge should be upheld or set aside. *Anderson v. Bessemer City,* 470 U.S. 564,

574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

We do note that there is one statement in the findings of fact that is contrary to the record evidence. In Finding 23, 700 F.Supp. at 1071, the judge stated that an RCO at Hays provided a communications link to the Russell FSS on the night of April 25, 1985. The record, however, shows that this station was not operational at that time. *See* VI R. at 937. However, we do not feel that this one erroneous finding about the station at Hays materially affects the judge's further finding that some source was available to Cunningham throughout the flight for obtaining weather information. 700 F.Supp. at 1072.

■ First, we will consider the plaintiffs' argument that the trial judge applied the wrong test of foreseeability. As the plaintiffs note, the Kansas Supreme Court has held that "[n]egligence, to be the proximate cause of an injury, must be such that a person of ordinary caution and prudence would have foreseen that an injury would likely result therefrom; not that the specific injury would result, but an injury of some character." *Atchison, Topeka & Santa Fe Ry. Co. v. Parry,* 67 Kan. 515, 73 P. 105, 107 (1903). In *Thummel v. Kansas State Highway Commission,* 160 Kan. 532, 164 P.2d 72, 78–79 (1945), the Kansas Court held that in fixing the proximate cause of injury or damage, it is not required that "a specific injury would probably result but only that some injury would likely result therefrom," citing *Walmsley v. Rural Telephone Association,* 102 Kan. 139, 169 P. 197 (1917). The Kansas test is in accord with the general rule. 4 Harper, James & Gray, *The Law of Torts* § 20.5 at 162–63 (2d ed.).

The findings of the trial judge state that

17. Negligent acts of Pilot Cunningham were unforeseen acts of gross negligence. FSS Specialist Mead was not required to foresee negligent or grossly negligent acts of pilots.... An FSS specialist may rely on the assumption that a pilot knows and will abide by all appropriate FAR's....

Here, the negligent acts of Pilot Cunningham were not foreseen by Mead. Mr. Mead expected Cunningham to take his advice and contact Wichita. Cunningham made no such attempt. (Plaintiff's pilot and causation expert, Jack A. Eggspuehler, testified on cross-examination that he would have expected Mr. Cunningham to attempt to contact Wichita at Mead's suggestion.) Moreover, Mead could not foresee that Cunningham would attempt to continue his flight over very low overcast cloud ceilings, and would fly for an extended period of time below FAR minimum altitudes.

700 F.Supp. at 1075–76.

The trial judge addressed the claim of error on the standard of foreseeability in his Memorandum and Order which overruled the plaintiffs' motion to alter, amend or reconsider the judgment. Appendix B to Brief of Plaintiffs–Appellants. We note that in their memorandum in support of their motion in the trial court, the plaintiffs made the precise contention now being advanced on appeal, arguing that "the standard as stated by the Court is incorrect because it is not whether intervening negligence is *unforeseen*, but rather whether it is reasonably foreseeable by the reasonable person of tort law." II Supp.R., Memorandum at 8. After considering the argument, the judge denied the motion, stating in his Memorandum and Order at 2:

> The court has thoroughly reviewed plaintiffs' arguments submitted with this motion; the law of Kansas regarding the questioned rules of law; and the facts in this case. The court is convinced that it correctly and properly applied the relevant law to the facts. The court wishes to reiterate its finding that under all the circumstances involved, *flight service station specialist Meade could not have reasonably foreseen the extraordinary and gross negligence of pilot Cunningham. See Tinkler*, 700 F.Supp. at 1075–76. Moreover, the court reaffirms its finding that the pilot's negligence was the superseding cause of the tragedy. Also, the court properly applied the concept of legal cause, as articulated by the Kansas courts, in finding that defen-

dant's negligence was not a legal cause of the crash. Therefore, the court will deny plaintiffs' motion to alter, amend or reconsider its judgment in this case.

(Emphasis added).

We are satisfied that there was no error in the analysis of the trial judge under the Kansas cases. He found both that "the negligent acts of pilot Cunningham were not foreseen by Mead," and that "Mead could not have reasonably foreseen the extraordinary and gross negligence of Pilot Cunningham." The findings accord with the Kansas decisions which refer to consequences that were actually unforeseen, *Citizens State Bank v. Martin*, 227 Kan. 580, 609 P.2d 670, 676 (1980), and the broader test of liability "if such act ought to have been foreseen." *Thummel v. Kansas State Highway Commission*, 160 Kan. 532, 164 P.2d 72, 78 (1945). Both of these standards are applicable according to the *Pattern Instructions for Kansas*, 2d, § 5.03:

> If, however, the intervening cause was foreseen or should reasonably have been foreseen by the person responsible for the first cause, then such person's conduct would be the cause of the injury, notwithstanding the intervening cause, and he would be liable therefor.

The application of the two standards is also noted in 4 Harper, James & Gray, *The Law of Torts* § 20.5 at 167 (2d ed.): "Foreseeability is to be determined in the light of what a reasonable person would have foreseen and is not limited to what defendant did in fact foresee, though it includes that."

We hold that the trial judge did not err in his application of Kansas law in this respect. He found both that the injury was not foreseen by Mead and that he "could not have reasonably foreseen the extraordinary and gross negligence of Pilot Cunningham."

■ Second, as a matter of fact the plaintiffs argue that the government could reasonably foresee the consequences of its failure to provide the weather information to Cunningham and reasonably foresaw that the failure to warn pilots of adverse weather can result in harm. Brief of Plain-

tiffs–Appellants at 18, 23. They say the judge erroneously determined that Cunningham's actions were not reasonably foreseeable solely on the basis of his conclusion that those actions constituted gross and wanton negligence and that the judge failed to examine the evidence to determine whether Pilot Cunningham's actions were reasonably foreseeable to the government. *Id.* at 37–38.

In attacking the foreseeability findings made below, plaintiffs rely in part on FAA training publications, Appendices C and D to the Brief of Plaintiffs–Appellants, as proving beyond doubt that the government could foresee the consequences of its negligence. The training manuals do serve as substantial evidence for the plaintiffs on the issues of what was foreseen and reasonably should have been foreseen by Mead as a consequence of not giving Pilot Cunningham the Hill City surface observation and the fact that IFR conditions were present there. In the manual, Appendix C to the Brief of Plaintiffs–Appellants, a story is told of a nearly tragic fictional flight as a common type of experience where pilots are enticed too far into IFR weather, trying to reach a destination. The manual states that a preflight briefing would have probably alerted the pilot and passenger to the danger. Then the following observations are made in the FAA manual:

> Many people in aviation may assume that most fatalities occur in the more violent hazards of thunderstorms and turbulence. In reality, in general aviation more lives are lost to the IFR producers than to those hazards we often consider more serious. No doubt, these results stem from the fact that pilots avoid thunderstorms and known areas of unusually severe turbulence or icing; but a pilot will more often let his desire to complete a flight entice him too far into low ceiling and poor visibility. ...

In addition, we note the testimony of Mr. Smoke, an FSS "Full Performance Specialist" for the plaintiffs with considerable service in the Flight Service System of the FAA. He opined that Mead did not act in the interest of pilot safety on the evening of the accident. He also was asked about

the known consequences of a Specialist's failure to inform of dangerous weather conditions, ground fog, lowering visibilities and lowering ceilings, and he replied:

> A. The aircraft accident records have fully demonstrated that a great many accidents are weather related. This in turn triggers the reaction to the Flight Service Specialist. He's very conscious of the fact that, particularly from the standpoint of lack of information or not providing information, could have an effect on the conduct, safe conduct of a flight. Very aware of it.
>
> Q. Is that known to Specialists?
>
> A. Absolutely.

IV R. at 392.

Further, there was testimony by Mr. Eggspuehler, President of the National Association of Flight Instructors, which the plaintiffs introduced. He was asked about whether the FAA's failure in this case continued and influenced and acted as the cause of the accident to the end. He replied: "I think it permeated the whole flight." IV R. at 514.

There were circumstances and testimony, however, giving substantial support to the trial judge's findings that the negligent acts of Pilot Cunningham were not foreseen by Mead, 700 F.Supp. at 1075, and that "under all the circumstances involved, flight service station specialist Meade [sic] could not have reasonably foreseen the extraordinary and gross negligence of pilot Cunningham." Memorandum and Order denying motion to alter, amend or reconsider the judgment at 2. For example, Mr. Eggspuehler on cross-examination said he would have expected Cunningham to follow the suggestion to contact Wichita if he was exercising good piloting practice, although he said this fell outside his area of expertise in the radio and human factors area. IV R. at 547. Eggspuehler said he himself was an experienced pilot. As Cunningham was traveling north, he would have been able to see these weather conditions developing up ahead of him. *Id.* at 547, 549. Eggspuehler was asked whether when Cunningham came back and started down

underneath and saw the conditions developing ahead, he would expect a pilot to turn around and go back to his point of departure. He said: "Yes. And I don't even know that he didn't do that." *Id.* at 550.

Dr. McFarland, an expert on avionics and radio wave atmospheric propagation as well as a pilot, studied the sources of information for pilots going from Dodge City to Hill City on April 25, 1985. VI R. at 890. At 4,000 feet AGL, he said Cunningham had excellent capability to communicate with other radio stations, in most instances with more than one station. He would have had excellent capability to do so down to 1,500 feet AGL. Below 1,500 feet, there would have been a marginal area; at 1,000 feet if one were careful in tuning, he could have communications. VI R. at 930–31. At Ness City, on Cunningham's route, McFarland said there was one of "the toughest" areas in which to establish communications on that route at 1,000 feet. *Id.* at 932. It was not possible to communicate through the Hays VOR that night of April 25, 1985; the voice link over the VOR was not functional that night. *Id.* at 937. Mead testified by deposition. He was asked if he was certain Cunningham could communicate with Wichita that night and he replied, "Yes." I R.Doc. 141 at 66–67. He had, however, heard communications with Wichita were "a little bit congested sometimes." *Id.* at 73.

■ Weighing all the record evidence, we cannot say the findings that Mead did not foresee the result and could not have reasonably foreseen the extraordinary and gross negligence of Cunningham were clearly erroneous. Foreseeability is an ultimate question of fact and a finding on the issue is protected by the clearly erroneous standard of Rule 52(a), Fed.R.Civ.P. *Doe v. United States,* 718 F.2d 1039, 1042 (11th Cir.1983); *see also Lee v. Mobil Oil Corp.,* 203 Kan. 72, 452 P.2d 857, 861 (1969) ("The question of foreseeability and causality of a claimed intervening cause ordinarily rests in the province of the trier of the fact."). In sum, we conclude that we should uphold the findings on foreseeability.

■ Third, plaintiffs maintain that the finding that Cunningham's actions constituted a superseding cause merely because they were gross and wanton negligence was error. We do not agree with the reasoning of the plaintiffs. The judge found that the gross negligence of Cunningham was not only an intervening cause, but was a superseding cause of the crash. 700 F.Supp. at 1074. Then he cited *Black v. United States,* 441 F.2d 741, 745 (5th Cir.), *cert. denied,* 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971). He pointed to its similar ruling where a pilot made a decision to proceed after seeing a storm. The court of appeals there found no proximate causation from the failure of an FSS operator two hours earlier to warn of the weather.

Here the trial judge found that Mead's negligent act, almost an hour before the crash, was not a legal cause of the crash. 700 F.Supp. at 1076. The intervening acts of Cunningham in deliberately proceeding, as he did, in the circumstances were so extraordinary as to become a superseding cause. *Black v. United States,* 441 F.2d at 745–56. We cannot agree that there was error in the finding of an intervening and superseding cause in Cunningham's actions. We feel that the judge weighed all the circumstances in making his findings.

■ Lastly, we have considered plaintiffs' argument that the pilot's later negligence was inextricably tied to Mead's earlier negligence; it could not be found to be a new, independent and unrelated efficient cause. Brief of Plaintiffs–Appellants at 48. We have also examined in connection with this contention *Freeman v. United States,* 509 F.2d 626 (6th Cir.1975), which is relevant to such an argument. There the trial judge found that an FAA traffic controller's earlier action in misidentifying an aircraft was the proximate cause of the deaths and injuries. *Id.* at 629. The Sixth Circuit held that the consequence of that earlier negligence continued during the entire episode and that intervening negligence by a jumpmaster and the pilot did not alone cause the tragedy; accordingly the court of appeals held that the intervening negligence there did not bar recovery.

*Id.* at 633–34. Here, however, the chain of causation was found to have been broken by Cunningham's actions, 700 F.Supp. at 1074—a finding on causation which was for the trial judge to make. We are not persuaded that the finding was clearly erroneous.

### V

Accordingly, no reversible error being demonstrated in the findings and rulings made, the judgment is AFFIRMED.